NEBRASKA DISTRICT OF EVANGELICAL LUTHERAN SYNOD OF
MISSOURI ET AL., APPELLANTS, V. SAMUEL R. MCKELVIE,
GOVERNOR, ET AL., APPELLEES.

FILED DECEMBER 26, 1919.    No. 21153.

1. **Statutes: CONSTRUCTION.** Statutes pertaining to the same subject-matter should be construed together, and this is particularly true if the statutes were passed at the same session of the legislature.

2. ————: ————. The legislature must be presumed to have had in mind all previous legislation upon the subject, so that in the construction of a statute we must consider the pre-existing law and any other acts relating to the same subject.

3. ————: ————. Where the general intent of the legislature may readily be discerned, yet the language in which the law is expressed leaves the application doubtful or uncertain, the courts may have recourse to historical facts or general information, in order to aid them in interpreting its provisions.

4. **Constitutional Law: STATUTE: CONSTRUCTION.** Since it ought never to be presumed that the legislature intended to violate the Constitution, a doubtful or ambiguous statute should be so construed as to uphold its validity.

5. **Evidence: JUDICIAL. NOTICE: ILLITERACY.** The court is entitled to take judicial notice of the facts disclosed by the operation of the federal selective draft law with reference to the inability of thousands of men born in this country to speak the language of their country, or understand words of command given in English.

6. **Schools and School Districts: FOREIGN LANGUAGE ACT.** The word "school" as used in chapter 249, Laws 1919, refers to and means a school which presents a course of study such as that prescribed in the compulsory education act, and attendance upon which would satisfy the requirements of that act.

7. **Constitutional Law: FOREIGN LANGUAGE ACT: CONSTRUCTION.** If the law should be construed to mean that parents or private tutors might teach a foreign language, but that others could not employ teachers to give such instruction in a class or school, it would be an invasion of personal liberty, discriminative and void, there being no reasonable basis of classification.

8. **Schools and School Districts: FOREIGN LANGUAGE ACT: CONSTRUCTION.** Chapter 249, Laws 1919, does not prohibit the teaching of a for-

eign language if taught in addition to the regular course of study in the elementary schools, so as not to interfere with the elementary education required by law, and outside of regular school hours during the required period of instruction.

9. Constitutional Law: FOREIGN LANGUAGE ACT: VALIDTY. The act in question is not strictly a penal statute, but is mostly remedial in its nature. It is not broader than its title, and not an unreasonable interference with the liberty or property of the plaintiffs and interveners.

APPEAL from the district court for Douglas county: ARTHUR C. WAKELEY, JUDGE. *Affirmed.*

*A. M. Post, John J. Sullivan, Albert & Wagner, Arthur F. Mullen* and *Joseph T. Votava,* for appellants.

*Clarence A. Davis, Attorney General,* and *George W. Ayres, contra.*

*A. H. Byrum* and *Joseph Wurzburg, amici curiæ.*

LETTON, J.

This is an action to restrain the enforcement of chapter 249, Laws 1919, on the ground that it violates several of the provisions of the Constitution of this state, and of the Fourteenth amendment to the Constitution of the United States. Joining with the plaintiffs and asking for the same relief are certain local church corporations conducting parochial schools, certain private schools, and several foreign language speaking parents.

In substance, the complaints of the plaintiffs and interveners are that, since the officers and members of the respective churches are largely made up of foreign language speaking people, if the act is enforced their children will be unable to obtain instruction in religion and morals in accordance with the doctrines of the religious denominations to which the parents belong, in the language of their parents; that many of the children cannot understand English, and cannot understand such instruction in that language; that in the parochial schools below the seventh grade the language of the parents is used in order to teach English, and that the children cannot

learn English if they do not receive rudimentary education in the tongue the parents use; that property rights in the school buildings and grounds, and in the good will of the schools, will be destroyed; that the defendants, McKelvie, as governor, Davis, as attorney general, and Shotwell, as county attorney of Douglas county, are severally threatening an enforcement of the act by causing the arrest and prosecution of the plaintiff's officers and teachers.

The enrolled act complained of is as follows, the copy in the published laws being slightly inaccurate: "An act relating to the teaching of foreign languages in the state of Nebraska:

"Section 1. No person, individually or as a teacher, shall, in any private, denominational, parochial or public school, teach any subject to any person in any other language than the English language.

"Section 2. Languages, other than the English language, may be taught as languages only after a pupil shall have attained and successfully passed the eighth grade as evidenced by a certificate of graduation issued by the county superintendent of the county in which the child resides.

"Section 3. Any person who violates any of the provisions of this act shall be deemed guilty of a misdemeanor, and, upon conviction, shall be subject to a fine of not less than twenty-five ($25) dollars, nor more than one hundred ($100) dollars, or be confined in the county jail for any period not exceeding thirty days for each offense.

"Section 4. Whereas, an emergency exists, this act shall be in force from and after its passage and approval."

A general demurrer to the petitions was sustained, and the action dismissed. Plaintiffs and interveners appeal.

The appellants assert that the act is not regulatory; that it is an unwarranted interference with purely domestic affairs, and an invasion of the inherent discretion of parents in prescribing the course of instruction

best adapted to the spiritual and material needs of children of their respective faiths; that the demurrer admits that many parents have reached an age where it is impossible for them to acquire a sufficient knowledge of English to enable them to counsel and admonish their children in matters of faith and morals in the English language, and that the teaching of foreign languages is largely to enable them to participate in the same religious services and exercises in the home and in the church; that the schools are private institutions, and having discharged their duty to the state by providing instruction equal to that of the public schools, they may not be penalized for giving additional instruction, whether religious or secular; that the understanding of other languages and literature is not harmful to the individual or to the state itself; that, so far as the act imposes a penalty upon teachers for giving instruction in other languages, it is violative of their constitutional right to engage in the practice of their profession or calling. They complain that the act discriminates against teachers who teach foreign languages in schools, and leaves the teacher who gives such lessons in private free to pursue his calling; that, if any teacher should open a night school to instruct those who could not understand English, in arts or sciences, he would violate the act, whereas another could form private classes and give instruction in a foreign language without offense.

They also maintain that the first section of the act is not within the title; that the state has power to regulate the course of study in the public schools, and prevent the study of any subject not in the course, and can regulate private schools so as to require them to maintain a like course of study, but has no power to prevent pupils in private schools from studying branches in addition to the course of study prescribed by the state; that the state cannot claim a monopoly of teaching; and that the right to study any subject is a personal right which is protected by the Constitution.

Previous to 1919 there was no provision in the statute expressly specifying the branches of study to be taught in the common schools. The operation of the selective draft law disclosed a condition in the body politic which theretofore had been appreciated to some extent, but the evil consequences of which had not been fully comprehended. It is a matter of general public information, of which the court is entitled to take judicial knowledge, that it was disclosed that thousands of men born in this country of foreign language speaking parents and educated in schools taught in a foreign language were unable to read, write or speak the language of their country, or understand words of command given in English. It was also demonstrated that there were local foci of alien enemy sentiment, and that, where such instances occurred, the education given by private or parochial schools in that community was usually found to be that which had been given mainly in a foreign language.

The purpose of the new legislation was to remedy this very apparent need, and by amendment to the school laws make it compulsory that every child in the state should receive its fundamental and primary education in the English language. In other states the same conditions existed, and steps have been taken to correct the evil. In 1919 the legislatures of Iowa, Kansas, Maine, Arkansas, Indiana, Washington, Wisconsin, and New Hampshire passed measures more or less drastic with regard to compulsory education in English, and the prohibition of the use of foreign languages in elementary schools.

It is a general rule that statutes pertaining to the same subject-matter should be construed together, and this is particularly so if the statutes were passed at the same session of the legislature. The general principle is that the legislature must be presumed to have in mind all previous legislation upon the subject, including statutes closely related, so that in the construction of this statute we must consider the pre-existing law, and any other

104 Neb.—7

acts relating to education, or subjects of instruction, passed at the 1919 session, which may tend to elucidate the intention of the legislature.

The compulsory education act of Nebraska, as amended in 1919, chapter 155, Laws 1919, requires that every child, or youth, not less than seven nor more than sixteen years of age, shall, during each school year, attend public, private, denominational or parochial day school for not less than twelve weeks, and in the city and metropolitan city school districts attend the full period of each public school year in which the public day schools are in session, with certain exceptions.

All private, denominational and parochial schools and all teachers employed or giving instructions therein, shall be subject to and governed by the provisions of the school laws of the state as to grades, qualifications and certification of teachers. They are required to have adequate equipment and supplies, and shall have grades and courses of study substantially the same as the public schools where the children will attend in the absence of private, denominational or parochial schools. Nothing in the act is to be construed as interfering with the religious instruction in such schools.

Instruction is required to be given in American history and in civil government, both state and national, such as will give the pupils a thorough knowledge of the history of our country, its Constitution and our form of government, and such patriotic exercises shall be conducted as may be prescribed by the state superintendent. It is also provided that nothing in the act contained shall be so construed as to interfere with religious instruction in any private, denominational or parochial school.

It is also settled law that, where the general intent of the legislature may be readily discerned, and yet the language in which the law is expressed leaves the application of it in specific instances obscure, doubtful, ambiguous or uncertain, the courts may have recourse to historical facts, or general public information, or the conditions

of the country at and immediately prior to the passage of the law, in order to aid them in interpreting its provisions. The language may be so indefinite that, if construed in one way, it may violate the Constitution, while, if construed in another equally permissible manner, its passage would not be inhibited. Since it ought never to be presumed that the legislature intended to violate the Constitution, the obvious and necessary construction to be given is that which will uphold the statute.

From a consideration of both of these statutes, as well as of chapters 248, 250, Laws 1919, it is clear that the purpose of the legislature was to abolish the teaching of foreign languages in elementary schools, when such schools are used for imparting the instruction required in the public schools, or the using of such languages as the medium of instruction; to provide that the standard of education prescribed for the elementary public schools should apply to all other schools; that the ordinary time and attention devoted to such instruction should not be diverted to other subjects, except as specified in the act; and that the same character of education should be had by all children, whether of foreign born parents, or of native citizens. The ultimate object and end of the state in thus assuming control of the education of its people is the upbuilding of an intelligent American citizenship, familiar with the principles and ideals upon which this goverment was founded, to imbue the alien child with the tradition of our past, to give him the knowledge of the lives of Washington, Franklin, Adams, Lincoln, and other men who lived in accordance with such ideals, and to teach love for his country, and hatred of dictatorship, whether by autocrats, by the proletariat, or by any man, or class of men.

Philosophers long ago pointed out that the safety of a democracy, or republic, rests upon the intelligence and virtue of its citizens. ''The safety of the people is the supreme law.'' The concept that the state is everything,

and the individual merely one of its component parts, is repugnant to the ideals of democracy, individual independence and liberty expressed in the Declaration of Rights, and afterwards established and carried out in the American Constitution. The state should control the education of its citizens far enough to see that it is given in the language of their country, and to insure that they understand the nature of the government under which they live, and are competent to take part in it. Further than this, education should be left to the fullest freedom of the individual.

The act as thus construed merely carries out the purpose of regulation to a greater extent than specified in the compulsory act. The term "school," as used therein, evidently means a school which presents a course of study such as those prescribed for the public schools, and attendance upon which would satisfy the requirements of the compulsory law. The intent evidently is that none of the time necessarily employed in teaching the elementary branches forming the public school curriculum shall be consumed in teaching the child a foreign language, since whatever time is devoted to such teaching in school hours, must necessarily be taken away from the time which the state requires to be devoted to education carried on in the English language.

Furthermore, there is nothing in the act to prevent parents, teachers or pastors from conveying religious or moral instruction in the language of the parents, or in any other language, or in teaching any other branch of learning or accomplishment, provided that such instruction is given at such time that it will not interfere with the required studies. The law only requires compulsory education for children not less than seven, nor more than sixteen years of age, for a period of not less than twelve weeks in certain districts, and a longer period in others. If a child has attended either the public or private school for the required time, it could not have been the intention of the legislature to bar its parents,

either in person, or through the medium of tutors or teachers employed, from teaching other studies as their wisdom might dictate.   There can be no question of the cultural effect of the knowledge of a foreign language. There is nothing in this statute to interfere with teaching the Bohemian language on Saturday or Sunday, as is done by the intervening Bohemian schools of Omaha and South Omaha.

The assertion that it is necessary to teach Polish in order to teach English does not seem well founded. It is said several times in the briefs, and it was said in the oral argument, that a number of statements in the petitions are admitted by the demurrer, and must be taken as true.   In a general sense a demurrer admits the allegations of the petition, but it does not admit conclusions drawn from the facts stated.   We think we are not bound to draw the conclusion that because children, when they first attend school, cannot understand or speak English, they must be taught the language of their parents, whether Polish or Bohemian, in order that they may learn English, otherwise no children of foreign speaking parents attending the public schools, wherein no other language than English is spoken, could ever learn the language.   It is common knowledge that the easiest way to learn a foreign language is to associate only with those who speak and use it.   Of course, the occasional use of a few words of the language of the home in order to explain the meaning of English words would not, if good faith is used, violate the act as seems to be feared.

The further objection is made by some of the interveners that, while they can understand and speak English to some extent, they are not sufficiently familiar with the language to give religious or moral instruction to their children in that language. There is no necessity that religious or moral teaching be given in English, and a parent who can speak and understand German, Polish, Bohemian, or any other language, can assuredly convey

lessons· of truth, morality and righteousness in that language. So with respect to the complaint that the pastor, or the teachers in private or parochial schools, cannot give moral and religious instruction in English, it is not the medium through which such ideas are conveyed that is material, it is the lessons themselves which are essential to right conduct and good citizenship, and, as we construe it, there is no prohibition in the act to interfere with such teaching in a foreign language. The contention made that, by virtue of section 2 of the act, no foreigner may be taught in any other language than English unless the pupil has successfully passed the eighth grade, as evidenced by a certificate issued by the county superintendent, must be taken as applying only to pupils attending public or private schools, and in the sense that a pupil in such schools may not there be taught any language other than English unless he has attained and passed the eighth grade. If the act should be construed to mean that no person could at any time be taught any other language than English unless possessed of a certificate of graduation issued by the county superintendent, it would be discriminatory as being an unreasonable exercise of the police power, and interfering with individual liberty.

If the law means that parents can teach a foreign language, or private tutors employed by men of means may do so, but that poorer men may not employ teachers to give such instruction in a class or school, it would be an invasion of personal liberty, discriminative and void, there being no reasonable basis of classification; but if such instruction can be given in addition to the regular course, and not so as to interfere with it, then equality and uniformity results, and no one can complain.

As to the allegations with respect to the invasion of property rights by depriving certain interveners of the value of the "good will" in their schools, no facts are alleged, but mere conclusions, which are not admitted by the demurrer.

It has been said that this is a penal statute, and must be strictly construed. In a limited and restricted sense the statute may be penal, but in our opinion it is remedial in its nature. It is designed to remove a condition seriously inimical to the public welfare. It must be reasonably construed, not alone by taking into account the words of the particular measure, but by considering the mischief which the legislature was endeavoring to remedy. If construed as plaintiffs and interveners contend, it could not be applied. If experience shows that the practical working of the act is harsh or inconvenient, even though valid and constitutional, the legislature will no doubt remedy its defects; and, if the legislation is unwise, those who are injured have an incentive to see that their views are represented in another legislature.

As to the contentions that the act is broader than its title, and that the subject of the first section is not embraced therein, it must be said that the title is exceedingly broad, "An act relating to the teaching of foreign languages in the state of Nebraska." The prohibition of the teaching of any other language than English in the first section clearly has relation to the teaching of foreign languages, and is within the title. The other section also "relates" to such teaching.

It has also been urged that the statute is unreasonable, and is therefore void. An unreasonable law is not necessarily unconstitutional, and the remedy for such an enactment is with the legislature by way of amendment or repeal.

It has been said by the United States supreme court in *Gundling v. Chicago,* 177 U. S. 183, 20 Sup. Ct. Rep. 633, that the courts will not interfere with the operation of a regulative statute, "unless the regulations are so utterly unreasonable and extravagant in their nature and purposes that the property and personal rights of the citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the state

to pass, and they form no subject for federal interference." *Giozza v. Tiernan,* 148 U. S. 657, 13 Sup. Ct. Rep. 721.

Neither the Constitution of the state nor the Fourteenth amendment takes away the power of the state to enact a law that may fairly be said to protect the lives, liberty and property of its citizens, and to promote their health, morals, education and good order. "If the state may compel the solvent bank to help pay losses sustained by depositors in insolvent banks, if it may enact workmen's compensation laws in order that the workman shall have no strained relations with his employer, nor become embittered towards society because, though an industry has crippled him, it has paid him nothing, if acts aiming to make better citizens by diminishing the chances of pauperism are sustained, if it is competent for the state to protect the minor from impoverishing himself by contract, it surely is not an arbitrary exercise of the functions of the state to insist" that the fundamental basis of the education of its citizens shall be a knowledge of the language, history and nature of the government of the United States, and to prohibit anything which may interfere with such education. Laws, the purposes of which are with respect to foreign language speaking children, to given them such training that they may know and understand their privileges, duties, powers and responsibilities as American citizens, which seek to prevent a foreign language from being used as the medium of instruction in other branches, and as the basis of their education, are certainly conducive to the public welfare, and are not obnoxious to any provision of either the state or federal Constitution.

AFFIRMED.

CORNISH, J., dissents.