CHICAGO ·& NORTHWESTERN RAILWAY COMPANY, APPEL-
LANT, V. OTTO J. BAUMAN, COUNTY TREASURER, ET AL., AP-
PELLEES.
CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COM-
PANY, APPELLANT, V. OTTO J. BAUMAN, COUNTY TREASURER,
ET AL., APPELLEES.

271 N. W. 256

FILED JANUARY 25, 1937.   NOS. 29938, 29939.

*Wymer Dressler, R. D. Neely* and *H. J. Lutz*, for appellants.

*James T. English, Jack W. Marer* and *H. C. Linahan, contra.*

Heard before GOSS, C. J., GOOD, EBERLY and CARTER, JJ., and MESSMORE, District Judge.

EBERLY, J.

These are companion cases in equity, in which identical issues are involved, and they differ only as to parties and amounts in suit. By stipulation of the parties, these cases were consolidated and heard as one case, upon a common record, though separate decrees were entered. The trial court denied plaintiffs any relief, and dismissed their actions, stating no reasons for his determinations, and plaintiffs have appealed upon a common record.

In this opinion we will consider the case of Chicago & Northwestern Railway Company (Charles P. Megan, Trustee, substituted) v. Otto J. Bauman, County Treasurer, et al., No. 29938. Our discussion here is applicable to case No. 29939, and the conclusion arrived at equally determinative thereof.

The petition before us challenges the correctness and regularity of certain proceedings taken by the city of Omaha in 1932-1933 in connection with the school districts thereof in the assessment, levy and collection of the respective taxes in suit for the benefit of each. The form in which these attacks of plaintiff are cast, as well as the reasons offered in support thereof, are varied and extended. However, analysis discloses that these objections all relate to, and grow out of, a course of official procedure which we infer has continued for a number of years past, and which may be illustrated by the following:

It appears that in August, 1932, the city of Omaha certified to the county clerk of Douglas county tax levies by the mayor and council approved, adopted in that year, and likewise certified certain school levies, approved and adopted by the school district board in 1932, to the same official. Thereafter an order was made and entered by the county board of equalization directing that the taxes so certified should be entered on the tax list of 1933, but computed and extended thereon upon the actual valuation and assessment as returned by the county assessor and as equalized by the county and state boards of equalization for the year 1932. The result of this procedure is that the city and school district taxes were placed on the county tax list of 1933 on the basis of the ownership and valuation as they existed and were shown by the county tax books of 1932, and the county and state levies were entered on this tax list of 1933 on the basis of the valuation and ownership as was determined by the county assessment and valuation of 1933.

Speaking generally, the prayer of the petition is for the recovery of the sum of $11,814.80 city and school district taxes, so placed on the assessment roll of 1933, heretofore paid by the petitioner under protest to the defendant county treasurer; for an injunction restraining further collection of certain city and school district taxes, in addition to those paid under protest, alleged to be thus illegally levied and assessed on plaintiff's property; and also for a mandatory injunction directed to the taxing officers involved requiring the correction of their taxing methods to comply with plaintiff's theory of the law governing that procedure.

As to the recovery by plaintiff of the sum of $11,814.80 alleged to have been unlawfully collected by the defendant county treasurer, the record discloses that this is the aggregate of payment of taxes made by plaintiff "under protest," as provided by section 77-1923, Comp. St. 1929. Within thirty days after each payment the plaintiff herein filed with the proper officer a statement in writing, duly verified, setting forth the amount of taxes thus paid under

protest, the grounds of such protest, etc. It further appears that thereafter the county board of Douglas county duly inquired into the matter and determined the same against the contention of the plaintiff. Thereupon plaintiff appealed from this decision then made to the district court for Douglas county in the manner provided by law, and caused a proper transcript on appeal to be filed in said court. Then plaintiff filed in said cause a petition for removal of said cause to the district court of the United States in and for the district of Nebraska, Omaha division, and tendered the required bond for such removal. Thereafter said bond was duly approved and an order duly made and entered in each of said causes by that court, adjudging that the cause of action "be and it is hereby removed from the said district court of Douglas county, Nebraska, into the district court of the United States in and for the district of Nebraska, Omaha division." A record of said cause was thereupon made up by the clerk of the district court for Douglas county, and transmitted to, and prior to the commencement of the present action was filed in, said district court of the United States in and for the district of Nebraska, Omaha division, in which court all of said causes of action thus removed are now pending.

These admitted facts invoke the application of the following controlling principles:

(1) The propriety of this removal is unchallenged by the parties to this cause. It has been actually accomplished. Under these circumstances this court does not see fit *sua sponte* to challenge the rightfulness of the proceeding, or to determine that these causes of action under consideration do not appear to be removable. Rather we will adopt the contrary view, and, for the purposes of this case, will assume but not determine that the causes of action were properly removed. Therefore, we are within the scope of the rule often announced, as stated in *Madisonville Traction Co. v. St. Bernard Mining Co.*, 196 U. S. 239, 244-245, viz.:

"If a case be a removable one, that is, if the suit, in its

nature, be one of which the circuit court could rightfully take jurisdiction, then upon the filing of a petition for removal, in due time, with a sufficient bond, the case is, in law, removed, and the state court in which it is pending will lose jurisdiction to proceed further, and all subsequent proceedings in that court will be void. *Railroad Co. v. Mississippi*, 102 U. S. 135, 141; *Railroad Co. v. Koontz*, 104 U. S. 5, 14; *Steamship Co. v. Tugman*, 106 U. S. 118, 122; *St. Paul & C. R. Co. v. McLean*, 108 U. S. 212, 216; *Crehore v. Ohio & M. R. Co.*, 131 U. S. 240, 243; *Kern v. Huidekoper*, 103 U. S. 485, 493; * * * *Marshall v. Holmes*, 141 U. S. 589, 595."

It follows that the district court of the United States in and for the district of Nebraska, Omaha division, has authority to hear, determine, and render judgment in the causes thus removed to it, to the exclusion of every other court. It also appears that this rule extends to and includes within it any independent suit commenced subsequent to such removal to the federal court. *Palmer v. Delaware, L. & W. R. Co.*, 222 Fed. 461.

(2) The record also affirmatively discloses that the jurisdiction of the district court of the United States for the district of Nebraska, Omaha division, had attached to the controversy, so far as the causes of action involving the recovery of the $11,814.80 were concerned, prior to the filing of the plaintiff's petition in the present case. These facts bring the case within the principle announced by this court in *Fitzgerald v. Fitzgerald & Mallory Construction Co.*, 44 Neb. 463, 62 N. W. 899, viz.:

"It is a rule recognized alike by state and federal tribunals that the court which first acquires jurisdiction of the subject of an action will retain such jurisdiction until the final determination of the controversy."

In *Taylor v. Taintor*, 16 Wall. (U. S.) 366, 370, the rule is stated in this language:

"Where a state court and a court of the United States may each take jurisdiction, the tribunal which first gets it holds it to the exclusion of the other, until its duty is

fully performed and the jurisdiction invoked is exhausted; and this rule applies alike in both civil and criminal cases. It is indeed a principle of universal jurisprudence that where jurisdiction has attached to a person or thing, it is —unless there is some provision to the contrary—exclusive in effect until it has wrought its function."

See, also, *Sharon v. Sharon*, 84 Cal. 424, 23 Pac. 1100; *Patterson v. Veasey*, 295 Fed. 163; *Burke Construction Co. v. Kline*, 271 Fed. 605; *Ward v. Foulkrod*, 264 Fed. 627; *State v. Chicago, R. I. & P. R. Co.*, 100 Neb. 268, 159 N. W. 410.

Therefore, it follows that this court will not entertain jurisdiction to determine plaintiff's right of recovery as to the taxes paid by it under protest, and that the action of the trial court in denying a recovery therefor is approved.

The other demands of plaintiff in this proceeding, not embraced in the recovery of the moneys so paid "under protest," must be determined by a proper construction of enactments applicable thereto.

It is a general rule: "In seeking to ascertain the legislative intent where the language of a statute is ambiguous, the courts will take into consideration all the facts and circumstances existing at the time of, and leading up to, its enactment, such as * * * the state of the existing law," etc. 59 C. J. 1014.

This court announced this principle in the following form: "The legislature must be presumed to have had in mind all previous legislation upon the subject, so that in the construction of a statute we must consider the pre-existing law and any other acts relating to the same subject." *Nebraska District of Evangelical Lutheran Synod v. McKelvie*, 104 Neb. 93, 175 N. W. 531.

With these principles in view, we note that, "An act entitled 'An act incorporating metropolitan cities, and defining, regulating, and prescribing their duties, powers, and government,' " was passed with an emergency clause, and was approved March 30, 1887. Laws 1887, ch. 10. This was the first creation of metropolitan cities in this state.

Section 79 of this act empowered the mayor and council to levy and collect general taxes to the extent therein specified. This section also provided: "The valuation of such property to be taken from the last previous assessment roll of the proper county, and it shall be the duty of the county clerk to permit the city clerk to make out from the assessment rolls of the county an assessment roll for the city of all property liable to taxation as above specified." By section 85 of this act, certain specific provisions were incorporated governing the year 1887, and this act then provided that the mayor and council should thereafter make the annual levy at the first regular meeting of the city council in February of each year. Section 86 provided that city taxes so levied should become delinquent on the first day of July next succeeding. Section 92 provided that "municipal taxes * * * upon real estate * * * are hereby made a perpetual lien thereupon from the day on which the same were levied.".

By section 10, ch. 7, Laws 1891, as subsequently enacted, pertaining to metropolitan cities and as part of the laws controlling city assessments, it was provided: "The valuation of such property to be taken from the last previous assessment book or books of the assessor, assessing property for and within metropolitan cities, as by him returned and assessed. The city clerk shall annually make a copy of such assessment for the purposes of taxation as herein provided and said assessor shall permit the making of the copy hereby contemplated."

In *State v. Mayor and City Council of the City of Omaha,* 39 Neb. 745, 58 N. W. 442, this law of 1891 was construed as requiring estimates of metropolitan school districts to be filed with the city council, and it was held that the power to determine the amount necessary to be raised by taxation and the levy required for that purpose was left with the city council, and an injunction to control their discretion was denied.

The next act which substantially changed the tax laws of cities of the metropolitan class was chapter 10, Laws

1897, which was passed with an emergency clause and took effect on March 15, 1897. It provided for a tax commissioner, who should be the assessor of the city; for the assessment of property for municipal purposes to be made by the tax commissioner and his deputies, appointed and qualified, between the 15th day of September and the 15th day of November of each year; for the review and equalization of such assessments; and that (sec. 138) "The mayor and council shall have power, and it shall be their duty, at the first regular meeting of the council in February in each year, by ordinance to levy taxes for municipal purposes on all the real estate and personal property, moneys and credits, including all interests, bonds, capital stock, franchise and businesses within the corporate limits of the city not exempt from taxation under the laws of this state, based upon the assessment for the year in which the levy is made," etc. The taxes so levied became delinquent on July 1st next succeeding the levy, and municipal taxes upon real estate were "made a perpetual lien thereupon from the day on which the same were levied." It is thought that under this act of 1897 the metropolitan school district taxes were properly levyable by the mayor and council of Omaha.

The next important change in the municipal revenue laws occurred when chapter 14, Laws 1905, was passed, with an emergency clause, and which went into effect on the day of its approval, viz., April 3, 1905. It repealed the provisions of law providing for a city tax commissioner, the annual listing and assessment of property by that officer and his deputies, the review and equalization thereof by city officials, and the extension thereof in a separate city tax list, etc. Among the powers vested by it in metropolitan cities was: "In addition to the powers herein granted, cities governed by this act shall have power by ordinance: * * * To levy any tax or special assessment authorized by law." Section 144.

Section 143 provided in part: "When by this act the power is conferred upon the mayor and council to do and

perform any act or thing, and the manner of exercising such power is not specially pointed out, the mayor and council may provide by ordinance the details necessary for the full exercise of such power."

Section 144a provided: "The city council of such city is hereby authorized, directed and required to levy and collect the number of miles (mills) reported and demanded by the board of education of metropolitan school districts as now and heretofore required by the law governing such school districts and nothing herein contained shall be construed to in any manner repeal, amend or abridge such school law."

Section 145 reads in part: "It shall be the duty of the council to annually certify by resolution to the county clerk of the county in which such city is located, a gross sum to be raised by taxation for all municipal purposes for the ensuing calendar year upon all taxable property within the limits of the city. * * * The council shall certify such sums before the county board of equalization has made a levy for county taxes. The council shall also certify the levy required by the board of education of such metropolitan school district and any other sum to the said county clerk as may be required by this act or by general law."

In section 146 the following appears: "The city council shall annually, in the first week in January after the levy provided for in the above section, set aside the following funds to be designated specific funds."

Section 160 provided for the following powers: "All general taxes of the city on personal and real property in such city shall be levied and collected as follows: The city council shall annually certify to the county clerk the amount of general tax required for the ensuing year and shall so certify in the time and in the manner required by the general revenue law of the state. The county board shall fix the rate of levy necessary to raise said amount on said property as assessed by the county officers and the state board of equalization and returned to the county clerk. The general taxes of such city shall be entered and collected as a part of the consolidated tax of such county."

In section 161 it is provided: "After the passage of this act, all general taxes on personal and real property in such city levied under this act shall become due May 1st and delinquent on July 1st of the year following the levy and shall draw the same rate of interest as the general taxes of the county and state. All general taxes levied and unpaid prior to the passage of this act shall become delinquent on the first of July next succeeding the levy thereof and shall draw interest at the rate of one per cent. per month payable in advance, which interest shall be collected at the same time and as a part of the delinquent tax."

It is stated in section 163: "All general municipal taxes upon real estate shall be a first lien upon the real estate upon which it is levied and take priority over all other encumbrances and liens thereon."

Section 166 provides: "No warrant other than the warrant of the county clerk, issued to the county treasurer, under the general revenue law shall be necessary for collection of the general taxes levied for such cities."

Section 185 provided for the relevy of any tax which was rendered invalid by any defect, error or irregularity.

Section 216 reads as follows: "The provisions of this act shall not be so construed as to impair or affect the validity of any tax or special assessment heretofore made or levied under the acts by this act repealed, but all such taxes and special assessments shall be and remain as valid and binding as if this act had not been passed, and shall be collected and enforced in the manner provided, or which may hereafter be provided by law for collecting and enforcing the same. Nothing herein shall be so construed as to prevent further and additional provisions being made for the collection of any tax or special assessment heretofore levied or made."

It appears that these provisions were subsequently amended, but only in minor particulars. Thus, for instance, in 1921 the words, "the number of mills which the city desires to be levied on each dollar" valuation, were by chapter 116 of Laws 1921 substituted for the words, "a

gross sum to be raised by taxation," as first enacted in 1905.

In substance, the general scheme of municipal taxation established by the act of 1905 thereafter continued unchanged, and many of its special provisions hereinbefore set out were incorporated in the Compiled Statutes of 1929 as sections 14-110, 14-501, 14-514, 14-548, 14-549, 14-554.

It follows, therefore, that the facts and circumstances existing at the time and leading up to the enactment of chapter 14, Laws 1905, and the construction and interpretation thereof as made thereafter by the municipal authorities become important in the interpretation of the controlling statutory provisions in the instant case.

It seems we are committed to the view that the construction of statutory provisions of doubtful meaning given them by those whose duty it was to enforce them, and which construction the legislature has by its continued noninterference for a number of years acquiesced in, will be approved, unless as thus construed they contravene some provision of the Constitution, or are clearly wrong. *State v. Bryan*, 112 Neb. 692, 200 N. W. 870. See, also, 36 Cyc. 1140; *State v. Holcomb*, 46 Neb. 88, 64 N. W. 437; *State v. Sheldon*, 78 Neb. 552, 111 N. W. 372; *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111, 119 N. W. 27; *Elmen v. State Board of Equalization and Assessment*, 120 Neb. 141, 231 N. W. 772.

The act of 1905, possibly for the purpose of effecting a saving of taxpayers' money, clearly evidences the legislative intent to completely dispense with the city tax commissioner, the listing and valuation of property for taxation for any purpose between the 15th day of September and the 15th day of November of each year, the review and equalization of such assessment by city officials, and the making of a city tax list, all at the expense of the city.

However, by this act the power to determine, levy and certify to the county commissioner the general taxes upon personal and real property was vested in the city council. The corresponding dates of required payment of such taxes

remained without change, as it had always been under all of the municipal charters, viz., due May 1st, and delinquent July 1st, "following levy." But no definite date for the making of the municipal levy by the mayor and council was prescribed. From the language appearing in section 146 of the 1905 act, viz., "the city council shall annually, in the first week in January after the levy provided for," set aside specific funds, it is obvious that the legislative intent is fairly expressed, that this levy to be made by the municipal authorities would be in or prior to January of the year in which the taxes so levied would become due and delinquent. Then, too, the language of the act of 1905 contains no express language identifying the particular county assessment or tax roll to which such levy was applicable, the words employed being, "on said property as assessed by the county officers and the state board of equalization and returned to the county clerk."

If it be conceded that the several provisions of the law of 1905, defining and vesting the right to levy taxes in cities of the metropolitan class, when construed together, create an ambiguity as to some details to be observed in carrying such powers into effect, such fact does not destroy the clear public duty to levy and collect such taxes. Express provisions in the statutes already quoted provide for that contingency. Therefore, we must conclude that, the right to levy the taxes by the municipal authorities being clearly conferred, the power of the municipality, in an appropriate manner, to supply "the details necessary for the full exercise of such power" must be admitted. Laws 1905, ch. 14, sec. 143, now Comp. St. 1929, sec. 14-110.

But, in the natural progress of events the interpretation of this 1905 law was presented to the municipal authorities in December, 1905. The saving clause thereof, above quoted (section 216), had continued the full force and effect of the levy made in February, 1905. This levy of February, 1905, so continued, was made on the listing and valuation as made by the city tax commissioner and deputies between September 15, 1904, and November 15, following. The pro-

visions of the 1905 act, heretofore quoted, construed together, in the light of the surrounding circumstances, fairly support the inference that they evidence the legislative intent that the first levy of municipal taxes thereunder was properly to be made not later than January, 1906. Laws 1905, ch. 14, sec. 146. In view of the power conferred upon the municipality, the duty to levy municipal taxes at some time in or prior to the month of January, 1906, and upon a proper valuation, was imperative. To levy these taxes prior to the last week in January on the listing and valuation thereafter to be made by the county assessors in 1906, which would not be final until reviewed and equalized by the board of equalization of Douglas county sitting in that year, and which might not be completed until after August, 1906, could certainly never have been intended. For the result of this interpretation would be that taxes levied in January, 1906, or prior thereto, on the valuation so arrived at, would, by the terms of the law controlling, be due May 1, 1906, delinquent July 1, 1906, and would bear penalties for sixty days prior to the time the basis of the assessment —the valuation of 1906—was available to the taxpayer for the determination of the amount of his taxes which the city was exacting in 1906. Then, too, particularly after the adoption of the amendment requiring taxes to be levied "by number of mills * * * on each dollar" valuation, such an interpretation would necessarily result in requiring a levy of taxes strictly limited by statute to be made prior to the possibility of ascertaining the "valuation," the limiting element on which such levy must be based. Obviously this result is so unreasonable that the construction of law upon which it must rest should not be adopted if another reasonable alternative is presented. This is afforded by the very terms of the act under consideration if the interpretation be accepted as requiring the levy in or prior to January, 1906, to be made on the last prior county and state listing and valuation of property for assessment, for such levy would then be applied to the assessment roll of 1905, with the result that all the calls of the statute would be met with-

out hardship or unreasonable exactions. It would be but recurring to, and adopting by the municipal authorities by construction, what was once expressly prescribed for this purpose by the act of March 1, 1887, viz., "the valuation of such property to be taken from the last previous assessment roll of the proper county." It would seem that this construction would be reasonable and substantially in harmony with all of the express terms of the act of 1905. In addition, it would also seem plain that, even if it be contended that it was essential that the municipal authorities exercise the powers on them conferred by section 143 of the act of 1905, they were not without full power so to do. It would seem to follow as a necessary conclusion that the acceptance of the county assessment roll as made in 1905, as determining the valuation and ownership of property for the purpose of the taxes assessed in or prior to January, 1906, must be deemed to have been contemplated by the act of 1905. The present record is silent as to what was actually done by the municipal authorities of Omaha between 1905 and 1933. Possibly we may not be justified in presuming that what was done in 1933, which is clearly established by the evidence in this record, represented the established course of procedure in Omaha continuously since 1905. But it must be admitted that the proceedings of the taxing authorities of Omaha in 1933, embodied in the bill of exceptions in this case, is strictly consistent with what is here presented as the proper interpretation of the act of 1905, as its provisions were continued in subsequent legislation and now remain in force and effect. In fact, the tax procedure then prescribed has continued and now remains substantially unchanged.

As to the questioned levies of city taxes which are not included in the causes of action removed to the federal district court, the procedure followed by the taxing authorities, so far as disclosed by the record and the facts as found in plaintiff's briefs, appears to have been in substantial conformity with the provisions of the act of 1905 as thereafter continued by subsequent amendments and reenactments, and which are now in force.

It would seem that the entire situation here presented is properly within the purview of the rule announced in *State v. Bryan,* 112 Neb. 692, 200 N. W. 870, hereinbefore referred to, which we are constrained to follow as the controlling principle applicable to the record before us.

The form of the action, as well as the issues as framed by the pleadings, imposed upon the plaintiff the burden of establishing the invalidity of the city taxes challenged, and this it has failed to do.

In this connection, we do not overlook the provisions of chapter 134 of the Laws of 1933. Assuming, but not determining, the validity of this enactment, its provisions are limited to dates of payment, dates of delinquency, and interest on city taxes, etc. Neither expressly nor by necessary implication does it in any manner alter the prescribed course of procedure in the determination of valuations, the securing of a listing of assessable property, and the making of the proper levy thereon. These remain unchanged, and since 1906 there has been provided by law but one annual levy of city and school district taxes. The effect of chapters 134 and 135 of the Laws of 1933, so far as applicable to the matters here under consideration, must be deemed as an act of grace on the part of the sovereign, extending the time for payment and delinquency of city levies of taxes to the respective dates expressed in these new enactments.

There being no proof in the record of the making of a double levy and assessment in any one year, this act of grace may not be made the basis of an attack on taxes in their origin properly annually levied and assessed.

Therefore, it follows that the actions of the district court for Douglas county in denying the relief prayed for and in dismissing this proceeding, as well as that of Chicago, St. Paul, Minneapolis & Omaha Railway Company v. Bauman, No. 29939, were, in all respects, correct and its judgments are

AFFIRMED.