EMIL PLACEK AND BANK OF PRAGUE, PRAGUE, NEBRASKA,
A CORPORATION, PLAINTIFFS AND APPELLEES, AND
LESHARA STATE BANK OF LESHARA, NEBRASKA, A
CORPORATION, INTERVENER AND APPELLEE, V. M. D.
EDSTROM, AS COUNTY ATTORNEY OF SAUNDERS
COUNTY, NEBRASKA, DEFENDANT AND APPELLANT.

26 N. W. 2d 489

Filed March 7, 1947.     No. 32141.

*Walter R. Johnson, Attorney General, Homer L. Kyle,* and *M. D. Edstrom,* for appellant.

*Peterson & Devoe,* for plaintiff-appellees.

*E. S. Schiefelbein,* for intervener-appellee.

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL, and WENKE, JJ.

CHAPPELL, J.

Bank of Prague and Emil Placek, its president, instituted this action to obtain a declaratory judgment construing Chapter 11, Session Laws of Nebraska, 1945, appearing as sections 8-163.01 and 8-163.02, R. S. Supp., 1945, and hereinafter generally designated as the act, to be permissive of an alleged new check-clearance exchange formula adopted by the bank after August 10, 1945, the effective date of the act, or in the alternative to declare the act unconstitutional and enjoin its enforcement. The act is generally known as the Par Check Law. The Leshara State Bank intervened, asking similar relief for itself and all other banks similarly situated who have strictly observed all provisions of the act since its effective date. All banks involved are state banks organized under the laws of this state and for convenience in this opinion will be generally designated as plaintiffs.

After trial upon the issues appropriately presented by the pleadings, the trial court concluded that plaintiffs' alleged new formula was prohibited by the act, and in its decree found generally for plaintiffs and against defendant, adjudged the act to be void as unconstitutional, and enjoined its enforcement. This was done upon the grounds that the act was repugnant to section 14, article III, Constitution of Nebraska, in that it was amendatory of sections 62-213 and 62-1,189, R. S. 1943, and neither contained nor repealed said sections as amended; that the act was repugnant to section 10, article I, Constitution of the United States, in that it impaired the obligations of contracts; and that the act was repugnant to section 3, article I, Constitution of Nebraska, and section 1 of the Fourteenth Amendment to the Constitution of the United States respectively, in that it deprived plaintiffs of property without due process of law, and denied them the equal protection of the laws.

Defendant's motion for new trial was overruled, and he appealed to this court, assigning substantially that

the trial court erred in so holding the act unconstitutional and enjoining its enforcement. We sustain that contention.

The act provides: "Section 1. All checks drawn on any bank or. trust company organized under the laws of this state shall be cleared at par by the bank or trust company on which they are drawn; *Provided,* the foregoing direction shall not be applicable where checks are sent to banks or trust companies as special collection items. Sec. 2. Any officer or employee of any such bank or trust company who violates the provision of this act shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than five dollars nor more than ten dollars for each offense."

Concededly, the proviso contained in section 1 is not involved in any manner and no trust company is a party to this action. Generally speaking, the case is one of first impression, although landmarks of law point the way to constitutional validity.

We have no doubt that the act may be considered as remedial in character. This court has held that: "A law is entitled to be considered remedial whether it remedies a defect of the common law or of a preexisting statute." Securities Investment Corporation v. Indiana Truck Corporation, 129 Neb. 31, 260 N. W. 691. This court has also affirmed that in a limited and restricted sense a statute may be penal yet remedial in its nature if designed to remove a condition inimical to the public welfare. Nebraska District of Evangelical Lutheran Synod v. McKelvie, 104 Neb. 93, 175 N. W. 531.

As early as Harmon v. City of Omaha, 17 Neb. 548, 23 N. W. 503, this court put its approval upon the following sage statement appearing in 1 Blackstone's Com., p. 87: "In construing remedial statutes there are three points to be considered, viz.: The old law, the mischief, and the remedy. That is, how the common law stood at the making of the act, what the mischief was for which the common law did not provide, and what

remedy the parliament hath provided to cure this mischief, and it is the business of judges so to construe the act as to suppress the mischief and advance the remedy." We have adhered to that position ever since in cases too numerous to cite here.

It was said in Nebraska State Railway Commission v. Alfalfa Butter Co., 104 Neb. 797, 178 N. W. 766: "The intention of the legislature is the law, and such intention is to be gathered from the meaning of the language used, in the light of the necessity for or reason of the enactment and the objects sought to be attained, and, in determining the meaning of the language, its ordinary and its grammatical construction is to be followed, unless an intent appears to the contrary, or unless, by following such construction, the intended effect of the provisions would apparently be impaired."

This court held in Nebraska District of Evangelical Lutheran Synod v. McKelvie, *supra:* "The legislature must be presumed to have had in mind all previous legislation upon the subject, so that in the construction of a statute we must consider the preexisting law and any other acts relating to the same subject," and "Where the general intent of the legislature may readily be discerned, yet the language in which the law is expressed leaves the application doubtful or uncertain, the courts may have recourse to historical facts or general information, in order to aid them in interpreting its provisions."

The act involved will be construed, therefore, in the light of such judicial direction. As in every other field, there has come about an unprecedented but natural evolution in the business of banking. The public use of its facilities has become almost universal. Its business is no longer localized. The vast bulk of the financial business and commerce of the country is now consummated by the use of checks on banks. They are now generally recognized as a safe and efficient method by which bank credit is transferred from one person to another through-

out the state and nation, upon which the necessities of all business, trade and commerce, as well as the financial safety, convenience, and welfare of the public is dependent.

Before checks came into such general usage, banks naturally collected legitimate exchange charges from their customers or depositors for making their funds available, by one recognized mode or another, at a distant place where the customers wished to use them in making a purchase or paying a debt, and they are not now prohibited by the act or by any other law from doing so with profit to themselves. However, with the almost universal use of checks by bank depositors, that method became more or less obsolete. Thus, in making such funds so available, the charge originally made to its customer, the drawer or payer of the check who so transferred his funds to another place, was arbitrarily shifted by some banks in a manner hereafter apparent, from their customer or depositor, who received the benefit thereof, to the payee, or holder of the check, as a so-called exchange charge, without his permission. The latter practice was ultimately recognized as an unjust exaction and became a source of greatest irritation both to banks and to the public. All national banks and most state banks have now long since generally abandoned the practice. Those who have abandoned it are called "par banks," and those who have not are called "nonpar banks." Plaintiffs come within the latter category.

Prior to the effective date of the act, nonpar state banks were exacting the so-called exchange charge from out-of-town checks drawn upon themselves, by their own depositors, at the time when such checks were directly presented by out-of-town banks, wherein they had been deposited, in cash mail letters for clearance, with request for collection and remittance, which was customarily consummated by draft drawn upon a correspondent bank and mailed to the forwarding bank.

Under its original formula, plaintiffs computed such charges at the rate of 5 cents on each check of $10 or less, 10 cents on each check over $10, subject to a limitation of not more than 50 cents for any one cash letter. The charges so computed were deducted from the total of all checks received in any one cash letter, and after such deduction was made and credited as a profit to itself, a draft was drawn by the bank and mailed in remittance of the balance to the forwarding bank.

After the act became effective, evidently conceding that its original formula was prohibited by it, the Bank of Prague adopted a so-called new formula which it claims was not prohibited by the act. Under that formula, it computes the total of all checks received in any one cash letter, deducts therefrom an amount equal to 10 cents for each $100 or fraction of the total, and after such deduction, draws a draft for remittance of the balance, which is mailed to the forwarding bank. The only difference observable to us between the old formula and the new is that the amount exacted and deducted under either one or the other might not be the same. In fact, there is simply a distinction without a difference between the two, and if the act is constitutionally valid prohibiting one, it certainly prohibits the other or both of them.

We come then to the question whether or not the act is constitutional. Its efficient words are: "All checks drawn on any bank * * * organized under the laws of this state shall be cleared at par by the bank * * * on which they are drawn; * * *." The requirement is not that all checks shall be paid at par, nor that they shall be collected at par. It is the manner in which all checks must be cleared by all state banks, and not that they must be paid or collected at all events, that is prescribed by the act. It is par clearance which is required.

In First State Bank v. Federal Reserve Bank, 174 Minn. 535, 219 N. W. 908, it was said: "Primarily the

benefit from having checks cleared at par goes to the makers of such checks, the customers of the bank upon which they are drawn. If such a customer can send his check to another city or place in payment of his debts or purchases and have the check cleared at par, he saves money and inconvenience, saves purchasing a draft and paying the exchange thereon. He cannot compel his debtor or obligee at the other end to accept his check subject to exchange charges. His bank is to that extent favoring him and incidentally attracting customers to itself."

In Farmers and Merchants Bank v. Federal Reserve Bank, 262 U. S. 649, 67 L. Ed. 1157, 43 S. Ct. 651, 30 A. L. R. 635, it was said: "Par clearance does not mean that the payee of a check who deposits it with his bank for collection will be credited in his account with the face of the check if it is collected. His bank may, despite par clearance, make a charge to him for its service in collecting the check from the drawee bank. * * * Par clearance refers to a wholly different matter. It deals not with charges for collection, but with charges incident to paying. It deals with exchange. Formerly, checks, except where paid at the banking house over the counter, were customarily paid either through a clearing house or by remitting, to the bank in which they had been deposited for collection, a draft on the drawee's deposit in some reserve city. For the service rendered by the drawee bank in so remitting funds available for use at the place of the deposit of the check, it was formerly a common practice to make a small charge, called exchange, and to deduct the amount from the remittance." It was a similar deduction by a drawee bank which the act involved sought to eliminate, but there is nothing in the act which prevents the bank from charging its customer or depositor for such services rendered to him for his benefit. Therefore, the act does not compel such a bank to donate the use of its services or property without compensation. It is

not thereby, or by any law related thereto, as will be hereinafter observed, compelled to do anything without compensation. Such banks are simply told that if they do clear checks, it must be done at par without deduction of a so-called exchange charge from remittances to forwarding banks.

A check can be paid by an individual, but it can be cleared only by a bank. In other words, a check can be paid without being cleared. In this state, when checks are forwarded to a drawee bank by another bank in a cash letter, the drawee bank now ultimately becomes the agent of the forwarding bank, and the holder of the check. When it charges the amount of the check to the account of its depositor it pays the check to itself as agent for the holder or forwarding bank, and thereafter holds the funds in a fiduciary capacity as such agent. The check is then paid but not cleared. It is only cleared when such funds are properly remitted to the forwarding bank. This court has held that the drawee bank may and does now act in a dual capacity, to wit: (1) As drawee in paying the checks to itself, and (2) as agent for the holder or forwarding bank in receiving its payment and clearing the check by directly remitting the funds in their hands to the forwarding bank. State ex rel. Sorensen v. Nebraska State Bank, 120 Neb. 539, 234 N. W. 82. See, also, §§ 62-207 to 62-216, inclusive, R. S. 1943.

The legal relationship, therefore, of drawee banks as agents with their principals, the holders of the checks, is entirely distinct and different from their relationship as drawees with their depositors, the payers or makers of the checks. Their relation with the depositors is contractual, actual or implied. City of Lincoln v. First Nat. Bank, 146 Neb. 221, 19 N. W. 2d 156. The act, it will be observed, does not relate to or affect the contract of a bank with its depositors. Therefore, it does not impair the obligations of such contracts in violation of section 10, article I, Constitution of the United States.

A check is a negotiable instrument. § 62-1,185, R. S. 1943. As such, it contains an unconditional order to pay a sum certain in money. §§ 62-101 and 62-1,126, R. S. 1943. It is discharged by payment in due course. § 62-1,119, R. S. 1943. The bank's duty to its depositor is to honor and pay its checks if, when presented, the drawer has on deposit sufficient funds available for that purpose. That duty is fully discharged when the bank receives, honors, and pays the depositor's check and complies with the order contained therein to pay the sum certain. However, that duty is subject to the common-law right of the bank, preserved by section 62-213, R. S. 1943, to refuse to pay checks drawn upon it as drawee otherwise than at its own counter. Therefore, the bank may insist that the holder or his representative receive payment over the counter and is not required to forward the proceeds to another place. Therefore, if a drawee bank undertakes to and does pay checks presented otherwise than at its own counter, such as checks received by mail in cash letters, it does so entirely outside its contract with and its legal duty to the depositor who draws the check. By doing so, the bank assumes new and different relationships and duties not based upon its contract with its depositors.

Section 62-209, R. S. 1943, provides: "Where the item is received by mail by a solvent drawee or payer bank, it shall be deemed paid when the amount is finally charged to the account of the maker or drawer." When that is done we are no longer concerned with the bank's legal duty to its depositor. That duty has been fully performed because checks drawn by the depositor have been discharged by payment in full at par to the bank. From that point on, the bank's legal obligation is to the holder, arising from the fact that the bank is then the holder's agent and possesses and holds the entire proceeds of the paid check in an agency-trust relationship. At that point clearance begins. The

act provides that: "All checks * * * shall be cleared at par," but at that point, the plaintiff bank makes a deduction from a trust fund held by it and remits the balance thereafter. It is that mischief which the act sought to remedy, and it relates to and affects only the capacity of a drawee bank as agent for the holder of checks drawn upon and paid to itself.

Section 62-1,189, R. S. 1943, specifically provides that a check does not of itself operate as an assignment of any part of the funds to the credit of the drawer at the bank, and that the bank is not liable to the holder unless and until it accepts or certifies the check. Certification is not involved here. It is clear that prior to the time when the check is accepted by the bank, it is under no legal duty to the holder thereof. That duty which is fiduciary in character, arises only when the bank accepts the check, charges it to the drawer's account, and pays itself the money. It is terminated only when full remittance is made to the holder. The act simply requires full performance of that duty.

At this point, it is well to say that we fail to see how the act could be violative of section 14, article III, Constitution of Nebraska, since it does not amend, or contain, or in any manner affect or repeal either section 62-213 or 62-1,189, R. S. 1943, or any other statute of Nebraska previously existent. Without doubt those sections and the act in controversy simply relate to the same or closely allied subjects and have a common purpose or the same general purpose and are component parts of the same general banking scheme or plan, therefore in pari materia. It is fundamental in this jurisdiction that statutes relating to the same subject, although enacted at different times, are in pari materia and should be construed together. Morrill County v. Bliss, 125 Neb. 97, 249 N. W. 98, 89 A. L. R. 932; McQuiston v. Griffith, 128 Neb. 260, 258 N. W. 553; Enyeart v. City of Lincoln, 136 Neb. 146, 285 N. W.

314; Hadley v. Corey, 137 Neb. 204, 288 N. W. 826.

We have heretofore found that the act did not impair the obligation of any contracts between the bank and its depositors. We turn then to the obligations of drawee banks to the holders of the checks. It is an elementary proposition of constitutional law that the obligations of a contract cannot be said to be impaired by a statute which was in force when the contract was made. Generally speaking, the laws in force ·at the time a contract is entered into form a part of it and enter into its obligation, but the law then in force affording a remedy for its breach may be modified or changed without impairing the obligation of the contract if an adequate remedy is left. Norris v. Tower, 102 Neb. 434, 167 N. W. 728.

Section 10, article I, Constitution of the United States, has reference only to laws enacted after the making of contracts, the obligations of which are claimed to be impaired. Lehigh Water Co. v. Borough of Easton, 121 U. S. 388, 30 L. Ed. 1059, 7 S. Ct. 916; Munday v. Wisconsin Trust Co., 252 U. S. 499, 64 L. Ed. 684, 40 S. Ct. 365; New Orleans v. New Orleans Water Works, 142 U. S. 79, 35 L. Ed. 943, 12 S. Ct. 142.

In the last cited case, it was said: " * * * we think that before we can be asked to determine whether a statute has impaired the obligation of a contract, it should appear that there was· a legal contract subject to impairment, and some ground to believe that it has been impaired; and that to constitute a violation of the provision against depriving any ·person of his property without due process of law, it should appear that such person has a property in the particular thing of which he is alleged to have been deprived."

Likewise, in Chicago, B. & Q. R. R. Co. v. Cram, 228 U. S. 70, 57 L. Ed. 734, 33 S. Ct. 437, involving a Nebraska statute, it was said: "The contention is made that the statute impairs the obligation of the contracts which existed between plaintiff in error and defendant

in error; but that contention was not made in the court below and cannot therefore be made here. Besides, there is no evidence of the contracts in the record. Contracts were pleaded and there appears to have been some attempt to introduce them in evidence, but unsuccessfully, and they were stricken from the bill of exceptions. But, assuming the contracts may be considered on this record, a complete answer to the contention that the statute impairs their obligation is, they were made subsequently to the statute and, therefore, are subject to it."

Contracts upon which plaintiff banks obligate themselves with holders of checks drawn on themselves are implied in law. They are necessarily of short duration and generally performed and fully executed the same day. Plaintiffs neither pleaded nor proved, nor did the trial court find that any such contracts were in existence and unexecuted on August 10, 1945, the effective date of the act. Every check drawn on plaintiff banks and received and paid by them thereafter was the subject of a new and separate contract between the bank and the holder, and embraced the act as an integral part thereof, which includes plaintiffs' statutory duty to remit the balance in full, that is to clear all checks at par.

Upon the basis of the analysis heretofore made, we conclude that the act did not impair the obligations of any contract between plaintiff banks and any other person, either depositor or holder, therefore it is not repugnant to section 10, article I, Constitution of the United States.

Finally, we have the question whether the act is unconstitutional upon the ground that it denies plaintiffs equal protection of the laws or deprives them of property without due process as in violation of section 3, article I, Constitution of Nebraska, and section 1 of the Fourteenth Amendment to the Constitution of the United States.

Section 8-110, R. S. 1943, specifically provides: "The business of banking, or the receiving of deposits of money or instruments of credit subject to be repaid upon check, draft, certificate, passbook or order; the discounting or negotiating of promissory notes, drafts, bills of exchange, and other evidences of debt; and the loaning of money upon personal or other security is hereby declared to be a quasi-public business and subject to regulation and control by the state."

It is generally held that: "Banks are indispensable agencies through which the industry, trade, and commerce of all civilized countries and communities are carried on; the business which they transact, though for private profit, is of a pre-eminently public nature, and is therefore universally recognized as a proper subject of legislative regulation under the police power of the state. The power of the legislature in this regard is supreme, subject only to such limitations as are imposed by the fundamental law." 7 Am. Jur., Banks, § 9, p. 30. See, also, Citizens State Bank v. Strayer, 114 Neb. 567, 208 N. W. 662; State ex rel. Chamberlin v. Morehead, 99 Neb. 146, 155 N. W. 879.

In speaking of due process of law and equal protection of the law, it was said by this court in Dysart v. Yeiser, 110 Neb. 65, 192 N. W. 953: "These constitutional provisions are intended to, and do, guarantee the right to make and enforce contracts as property rights, but the right to make and enforce contracts may be restricted and is subject to such limitations as the state, in the proper exercise of its police power, may impose. That is to say, it is subject to reasonable restraint and regulation in the interest of the public welfare."

In State ex rel. Sorensen v. Nebraska State Bank, 124 Neb. 449, 247 N. W. 31, it was held: "The business of banking involves more than the creation of a private debtor and creditor relation, and embraces the establishment of a public instrumentality for the discharge of a public purpose for the promotion of public good."

No part or provision of the federal constitution was ever intended to take from the states the right to properly exercise their police powers, which generally extend to all the great public needs which are lawfully recognized as immediately necessary to promote the public welfare. That such power may be exercised by a state within reasonable limits to regulate the business of banking, whose facilities are generally recognized as an indispensable condition of commerce, is well established. Noble State Bank v. Haskell, 219 U. S. 104, 55 L. Ed. 112, 31 S. Ct. 186, rehearing, 219 U. S. 575, 31 S. Ct. 299, 55 L. Ed. 341; Shallenberger v. First State Bank, 219 U. S. 114, 55 L. Ed. 117, 31 S. Ct. 189; In Re Opinion of Justices, 278 Mass. 607, 181 N. E. 833; Holland v. Nakdimen, 177 Ark. 920, 9 S. W. 2d 307; State ex rel. Chamberlin v. Morehead, *supra.*

In Wenham v. State, 65 Neb. 394, 91 N. W. 421, this court said: "All property in this state is held subject to rules regulating the common good and the general welfare of our people. This is the price of our advanced civilization, and of the protection afforded by law to the right of ownership and the use and enjoyment of the property itself. Rights of property, like other social and conventional rights, are subject to reasonable limitations in their enjoyment, and to such reasonable restraints and regulations by law as the legislature, under the governing and controlling power vested in them by the constitution, may think expedient. This power, legitimately exercised, cannot be limited by contract, nor bartered away by legislation. It is a power that is necessarily inherent in every form of government. This inherent power, reasonably used, may be said to be due process of law. * * * The police power of the state can not be put forward as an excuse for oppressive and unjust legislation, but it may be lawfully resorted to for the purpose of preserving the public health, safety or morals; and a large discretion is vested in the legislature to determine, not only what the interests of the public

require, but what measures are necessary for the protection of such interest."

In Pascagoula Nat. Bank v. Federal Reserve Bank of Atlanta, 3 F. 2d 465, of which the United States Supreme Court refused to take original jurisdiction because the constitutional question raised was not sufficiently substantial (269 U. S. 537, 70 L. Ed. 400), it was said: "The result of these provisions of the Reserve Act so construed is to require a member bank to pay without deduction checks drawn on it when presented by its Reserve Bank, whether paid over its counter or by the more convenient means of a check on its own deposits elsewhere. This takes none of the property or property rights of complainant without due process of law. Complainant may refuse to pay otherwise than in cash over its counter, according to the common law, as, on the other hand, the Reserve Bank may insist on that sort of payment. What is lost is the right to agree on a compensation for a more convenient payment by draft on more accessible reserves when both parties are willing so to agree. That the state, having power over the state banker and his business, may regulate his method of receiving and paying out his deposits was ruled in Farmers' & Merchants' Bank of Monroe v. Reserve Bank of Richmond, 262 U. S. 649, 43 S. Ct. 651, 67 L. Ed. 1157, 30 A. L. R. 635. A similar power must be recognized in the United States to regulate the banking in the Federal Reserve system. Complainant, being a national bank, chartered to do its business under the federal laws, cannot complain that those laws are not, or do not remain, such as it would prefer. It is not compelled to do anything without compensation. It is simply told that, if it does the thing in question, it must be done without compensation. Noble State Bank v. Haskell, 219 U. S. 575, 31 S. Ct. 299, 55 L. Ed. 341." We conclude, therefore, that plaintiffs were not deprived of property without due process of law.

In Farmers & Merchants Bank v. Federal Reserve

Bank, *supra*, it was said: "It is well settled that the legislature of a State may (in the absence of other controlling provisions) direct its police regulations against what it deems an existing evil, without covering the whole field of possible abuses. * * * If the legislature finds that a particular instrument of trade war is being used against a policy which it deems wise to adopt, it may direct its legislation specifically and solely against that instrument. * * * If it finds that the instrument is used only under certain conditions, or by a particular class of concerns, it may limit its prohibition to the conditions and the concerns which it concludes alone menace what it deems the public welfare." It will be noted that the classification of the act is all inclusive of all checks drawn upon and cleared by all state banks. The record in this case discloses ample grounds for such a classification. Hence, there was no denial of equal protection of the laws.

In the light of the situation heretofore presented, we can only decide that the act is an entirely reasonable exercise of the police power of this state and not repugnant to section 3, article I, Constitution of Nebraska, or section 1 of the Fourteenth Amendment to the Constitution of the United States.

We conclude that the trial court was right when it found that plaintiffs' new formula was prohibited by Chapter 11, Session Laws of Nebraska, 1945, but erroneously adjudged that the act was unconstitutional and void and erroneously enjoined its enforcement by the defendant. For the reasons heretofore stated, the cause is reversed and remanded with directions that the trial court enter a decree in favor of the defendant and against plaintiffs, in conformity with this opinion, with costs taxed to plaintiffs, Emil Placek and Bank of Prague, except that intervener shall be taxed with all costs of intervention.

REVERSED AND REMANDED WITH DIRECTIONS.