BEN L. SELIG ET AL., CO-PARTNERS DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF ESSE SALES SERVICE AND ENGINEERING AND ESSE RADIO COMPANY, APPELLEES, V. WUNDERLICH CONTRACTING COMPANY, A CORPORATION, APPELLANT.

65 N. W. 2d 233

Filed July 2, 1954. No. 33477.

*Fraser, Connolly, Crofoot & Wenstrand, C. Russell Mattson, Ben H. Powell, Jr.,* and *W. Morgan Hunter,* for appellant.

*C. L. Clark, Davis, Healey, Davies & Wilson,* and *Robert A. Barlow, Jr.,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action for damages for failure to deliver merchandise which it is alleged defendant agreed to sell to the plaintiffs. Issues were made and trial had. At the close of all the evidence defendant moved for a directed verdict. This motion was overruled. The jury returned a verdict for the plaintiffs upon which judgment was entered. Defendant moved for judgment notwithstanding the verdict or in the alternative for a new trial assigning many alleged errors. Plaintiffs moved for an order allowing interest on the judgment from the date of breach of contract. All motions were denied. Defendant appeals. Plaintiffs cross-appeal on the interest matter. We reverse the judgment of the trial court and

remand the cause with directions to sustain defendant's motion for judgment notwithstanding the verdict.

The first question presented is that the trial court erred in not sustaining the motion for a directed verdict and for judgment notwithstanding the verdict. For the determination of this question we review the evidence subject to the rule that: "A motion for directed verdict or its equivalent must, for purpose of decision thereon, be treated as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor and to have the benefit of every inference that can reasonably be deduced from the evidence." Cunning v. Knott, 157 Neb. 170, 59 N. W. 2d 180.

The plaintiffs are co-partners. The defendant was the purchaser from the government of a large number of airplanes which were to be dismantled. For the most part the evidence of plaintiffs, recited herein, was given by one of the partners who was active in negotiating the contracts involved.

On January 15, 1947, the plaintiffs submitted a written purchase order to defendant for some 17 items which either had been or were to be stripped from these planes. Defendant accepted the offer. The terms of payment were "Cash prior to shipment $2000.00 Deposit." The contract was entered into at Kingman, Arizona. Plaintiffs' home office and place of business was in Indianapolis, Indiana. As payment of the deposit plaintiffs gave defendant their check for $2,000 drawn on an Indianapolis bank. Defendant endorsed the check payable to the order of a Kingman bank "FOR DEPOSIT ONLY." The Kingman bank sent the check to the Harris Trust and Savings Bank of Chicago. From there it went to the Federal Reserve Bank of Chicago. That bank sent it by "cash" letter to the Indianapolis bank where it was received on January 21, 1947. Payment was refused for insufficient funds and the check was sent to

the clearing house for protest on behalf of the Indianapolis bank. The Federal Reserve Bank was advised by wire that the check was being sent to protest and the Harris Trust and Savings Bank was in turn advised of that fact by telephone.

Certificate of protest was made on January 21, 1947. Eight carbon copies of the notice of protest were made and sent to the Federal Reserve Bank.

The check with certificate of protest was returned by the clearing house to the Indianapolis bank on January 22, 1947. On that day the plaintiffs made a deposit of $5,000. The Indianapolis bank accordingly accepted and paid the check and wired the Federal Reserve Bank that payment was being made. That bank in turn telephoned the fact of payment to the Harris Trust and Savings Bank. Its credit of the item with the Federal Reserve Bank was not disturbed. The check was charged to plaintiffs' account on January 23.

Defendant apparently received notice from the Kingman bank that the check had been protested on January 27, 1947, for under that date it issued instructions to make no shipment on the contract of January 15.

Defendant received the notice of protest on January 28, 1947. Defendant, through its broker, advised plaintiffs that the check had been protested.

On that day plaintiffs wrote defendant that they could not understand why the check was "returned"; that "the bank informs us" that it refused to honor checks against deposits which were uncollected funds; that there were discrepancies in their books; that they had discharged their bookkeeper and had a "CPA, now engaged on the books"; that their next remittances would be made by cash or certified check; and that one of the plaintiffs would be in Kingman about February 15, 1947, and "inform you the reason for our trouble." On the same day plaintiffs wired defendant that the check was "okay. Send through again. Explain in letter."

Plaintiffs' office was 5 blocks from its bank. They

deny having a conversation with the bank about the check "before we sent the certified check," although it is noted that their letter of January 28, 1947, referred to what their bank "informs us."

On February 12, 1947, defendant wrote plaintiffs referring to the request that the check "which was under protest should be resent through the banks for payment. To date the bank has been unable to collect on this check" and requested a certified check.

One of the plaintiffs went to Kingman, arriving there on February 12, 1947, and was advised that defendant was "still not delivering merchandise and still denying payment of the two-thousand dollars." He testified that he was told the check had been sent through for a second time and that there was no reason to disbelieve defendant. Defendant asked for another check and plaintiff promised to have a certified check sent. Plaintiff arranged to have a certified check sent to its representative in care of defendant. He then departed from Kingman agreeing to return on February 20, according to plaintiff. Defendant testified that plaintiff agreed to deliver either cash or a certified check by February 18.

On February 19, 1947, defendant received an offer from another party for one of the items covered by the contract of January 15 with plaintiff and confirmed the offer upon receipt of purchase order and $750 deposit. The purchase order was executed on March 1.

Also on February 19, 1947, defendant wrote plaintiffs that due to the fact that they had not adjusted the deposit matter, it "reserves the right to dispose of any or all items on your purchase order which are to be sold from this field to other purchasers." This letter was received by plaintiffs on February 21.

On February 20, 1947, one of the plaintiffs was at Kingman, talked to defendant, and tendered a $2,000 certified check. Defendant refused to accept the check and advised plaintiff that it had cancelled the contract and

had sold two of the items to others and " 'If you do want the rest of the items you can have them.' "

Plaintiff testified, "I knew I was being hoodwinked at that time. There was something wrong. I couldn't understand the original instrument being bad. * * * so I let it be known." Defendant offered to cancel the whole contract. Plaintiff testified, "There was, of course, these other items we could make money on, so I said, 'No, I would like to have the other items.' " The defendant refused to reinstate the contract " 'without taking these two items off.' " So after "considerable argument" plaintiff agreed " 'under protest.' " Plaintiff "did consent" to the deletion of the two items. The parties then endorsed the contract opposite the two items here involved (and one other) "None from Kingman," and initialed the change.

Plaintiff testified that he asked for the original check and that defendant promised to get it from the bank and return it the next day, which was not done.

Other and subsequent fact matters will be referred to later herein.

The issue on the assignment now being considered narrows down to this. Was the contract of January 15, 1947, modified by the contract of February 20, 1947, so that defendant was under no obligation to deliver the deleted items?

There is argument in the briefs that the banks that handled the check from Kingman to Indianapolis were agents of defendant and hence defendant had imputed knowledge that the check had been paid. Defendant does not dispute that but asserts that the Indianapolis bank in making the payment was an agent of the plaintiffs and hence plaintiffs had imputed knowledge also. The plaintiffs say there was no duty of the drawee bank to give notice of payment. We are cited to no authority holding that the banks handling the check, as was done here, had a duty to notify of the payment of the check. It is contrary to ordinary business practices. In Harga-

dine McKettrick Dry Goods Co. v. Krug, 2 Neb. (Unoff.)
52, 96 N. W. 286, it was pointed out that the imputed
knowledge rule was a harsh and severe one and was to
be rigidly confined to those cases to which it is strictly
applicable. The rule is there stated: "Notice to or
knowledge by an agent is imputed to his principal in
those cases only in which it is his duty to act upon it,
or to communicate it to his employer, in the proper dis-
charge of his trust as such agent, and it possesses that
character in those cases only in which it has a direct
relation to the act or business which the agent is em-
ployed to do."

The argument about imputed knowledge may be put
aside for another reason. Plaintiffs state that both parties
thought the check had not been paid, that the deposit had
not been made, and that belief was crucial to all nego-
tiations underlying the agreement of February 20, 1947.
Plaintiffs assert that the contract of February 20, 1947,
had no legal effect between the parties because it was
without consideration and was based on a mutual mis-
take of fact and was a legal nullity. Of course, there
could be no mutual mistake if defendant had imputed
knowledge of the payment of the check.

As to consideration the rule in this state is: "A con-
tract containing mutual obligations of the parties there-
to by mutual consent may be changed or modified in
one or more of its details at any time after its execution,
and before a breach has occurred, by a new agreement
without any new, independent or distinct consideration."
Moore v. Markel, 112 Neb. 743, 201 N. W. 147.

We are not here dealing with an ordinary modifica-
tion of a contract but rather with a compromise and
settlement.

Giving the plaintiffs the benefit of the inferences in-
volved, we start with the proposition, as plaintiffs sug-
gest, that both parties entered into the agreement of
February 20, 1947, believing that the check had not
been paid. Neither party made inquiry at the source

that was available to it. Plaintiffs made no effort to go to their bank, 5 blocks away, to find out what happened to the check. Defendant made no effort to find out what disposition had been made of the check. Beginning with the notice of protest defendant assumed and thereafter made representations that the check had not been paid. There was ample time, at least as to a part of these representations, for plaintiffs to have inquired and determined their truth before February 20, 1947. Plaintiffs did not do so.

With that situation existing we come then to the agreement of February 20, 1947.

There is no dispute about the following facts. Plaintiffs' evidence shows them. On February 19, 1947, defendant wrote plaintiffs at Indianapolis that due to the fact that the deposit matter had not been adjusted defendant reserved the right to dispose of any and all items on the purchase order to other customers. This letter did not reach Indianapolis until February 21.

However, on February 20, 1947, when plaintiffs tendered the $2,000 certified check to defendant it was refused on the ground that defendant had cancelled the contract. Defendant prior thereto had refused to make delivery of merchandise.

Plaintiffs on February 20, 1947, were confronted with those facts. Defendant offered to " 'cancel the whole contract and forget everything.' " Plaintiffs knew something was wrong and that they were being "hoodwinked." The word is defined as meaning to deceive by false appearance, to impose upon. Webster's New International Dictionary (2d ed.), 1197. The generally accepted meaning of hoodwinked is "to deceive as if by blinding, to impose upon, to delude." State ex rel. Green v. Holzmueller, 40 Del. 16, 5 A. 2d 251.

With knowledge of those facts plaintiffs elected to enter into the agreement of February 20, 1947, and to accept the modified contract. They state their reason. "There was, of course, these other items we could make

money on" and they "would like to have the other items."
The modification of the contract was then made and
the $2,000 certified check was tendered and accepted.

Whether or not defendant had a legal right to declare the January 15, 1947, contract cancelled is not
material here. It did so. The rule is: "* * * where
parties settle a dispute upon a legal question, the fact
that there was in truth no actual doubt about the law,
will not render such settlement nugatory; the fact that
the point which was compromised could have been decided but one way under the facts in the case is no
ground for repudiating the compromise." Connor v.
Etheridge, 3 Neb. (Unoff.) 555, 92 N. W. 135.

Thereafter plaintiffs and defendant proceeded to perform under the February 20, 1947, agreement.

On March 4 and March 11, 1947, by letter plaintiffs
advised defendant that they had discovered that the first
$2,000 check had been paid, asked for credit for the
$4,000 paid, and asked for advice as to whether or not the
original contract had been reinstated. Defendant replied March 18, advising that credit had been given for
the $2,000 on purchases made or to be made and that the
original contract was not reinstated. Plaintiffs then on
March 21, 1947, demanded full reinstatement which defendant denied on April 11, 1947.

Thereafter it appears that plaintiffs accepted goods
and defendant delivered goods covered by the February
20, 1947, agreement until as late as October 1947. Plaintiffs did that with full knowledge of the facts of the payment of the protested check, and with full knowledge
of the fact that defendant refused to reinstate the January 15, 1947, agreement and considered the February
20, 1947, agreement as binding and controlling.

"It is a well-established rule that voluntary settlement
of doubts and disputes between parties is to be encouraged * * * and will not be disturbed for any ordinary mistake either of law or of fact, since their very
object is to settle disputes without judicial controversy..

In the absence of fraud, misrepresentations, concealments or other misleading incidents a voluntary compromise must stand." Bakke v. Bakke, 242 Iowa 612, 47 N. W. 2d 813. See, also, 11 Am. Jur., Compromise and Settlement, § 4, p. 249; 15 C. J. S., Compromise and Settlement, § 23, p. 738.

"* * * the mistake which would authorize the setting aside of an ordinary contract will not in all cases justify the setting aside of a compromise agreement; and the rule has been stated to be that such agreements will not be disturbed for an ordinary mistake of law or fact, in the absence of other circumstances rendering it inequitable to sustain them." 15 C. J. S., Compromise and Settlement, § 36, p. 757.

"A compromise will not be disturbed for mistake where the means of knowledge were accessible and the complaining party failed to exercise reasonable diligence to inform himself. In the absence of any confidential or fiduciary relation, a party cannot complain because the opposite party failed to volunteer information, or even made false statements as to matters as to which the complaining party could have informed himself." 15 C. J. S., Compromise and Settlement, § 36, p. 759.

"A party to an agreement of compromise and settlement may, on the theory of ratification, waiver, or estoppel be precluded from objecting thereto or avoiding it, * * * or by acceptance and retention of the benefits of the agreement with knowledge of facts invalidating it. So, if a party makes a compromise in ignorance of facts, and after the facts are known receives without objection the balance due him by the compromise, he thereby waives the rights which he might otherwise have had." 15 C. J. S., Compromise and Settlement, § 40, p. 761.

We have then an executed compromise and settlement of an agreement between these parties based on a valuable consideration.

Defendant's motion made at the close of all the evi-

dence and its motion made for judgment notwithstanding the verdict should have been sustained.

Other assignments of error and the cross-appeal need not be considered.

The judgment is reversed and the cause is remanded with directions to sustain defendant's motion for a judgment notwithstanding the verdict.

REVERSED AND REMANDED WITH DIRECTIONS.

CHAPPELL, J., dissents.