BEN L. SELIG ET AL., CO-PARTNERS DOING BUSINESS UNDER THE FIRM NAME AND STYLE OF ESSE SALES SERVICE AND ENGINEERING AND ESSE RADIO COMPANY, APPELLEES, V. WUNDERLICH CONTRACTING COMPANY, A CORPORATION, APPELLANT.

69 N. W. 2d 860

Filed April 22, 1955. No. 33477.

216

*Fraser, Connolly, Crofoot & Wenstrand, C. Russell Mattson, Ben H. Powell, Jr.,* and *W. Morgan Hunter,* for appellant.

*C. L. Clark, Davis, Healey, Davies & Wilson,* and *Robert A. Barlow, Jr.,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CARTER, J.

This is an action for damages for breach of contract. A verdict and judgment for $70,000 were obtained by plaintiffs. An appeal was taken to this court where the judgment was reversed and the cause remanded with directions to sustain defendant's motion for a judgment

notwithstanding the verdict. Selig v. Wunderlich Contracting Co., 159 Neb. 46, 65 N. W. 2d 233. Plaintiffs filed a motion for a rehearing. This court allowed a reargument on the motion.

The record shows that Ben L. Selig and Stanley Selig were co-partners doing business under the firm names of Esse Sales Service and Engineering Company, and Esse Radio Company, with their principal place of business in Indianapolis, Indiana. We shall hereafter refer to the partnership as Esse. The defendant Wunderlich Contracting Company is a Nebraska corporation which, for convenience, we shall refer to as Wunderlich.

The defendant purchased a large number of surplus aircraft at Kingman, Arizona, from the government which were required to be dismantled by the purchaser. On January 15, 1947, Esse submitted an offer to Wunderlich for 17 items which were to be stripped from these planes. The offer was accepted. The contract was entered into at Kingman, Arizona, whereby it was provided that Esse was to make a deposit of $2,000 and pay cash prior to the shipment of the items purchased. Pursuant to the terms of the agreement, Esse gave its check to Wunderlich for $2,000 bearing date of January 15, 1946, but which was actually given on January 15, 1947.

The check was drawn on the American National Bank, Indianapolis, Indiana. It was deposited with the Valley National Bank, Kingman, Arizona, which bank forwarded it for collection in the usual course of business. The Indianapolis bank received it on January 21, 1947, and refused payment. The check was returned to the clearing house in Indianapolis where it was protested and protest notices mailed. On January 22, 1947, Esse made a $5,000 deposit in the Indianapolis bank. The check was returned and paid by the Indianapolis bank on January 23, 1947. Wunderlich received notice on January 27, 1947, from the Kingman bank that the check had been protested and on that date it issued

instructions to make no shipments on the contract of January 15, 1947. On January 28, 1947, Wunderlich, through its broker, advised Esse that the check had been protested. Esse advised Wunderlich under date of January 28, 1947, that the check had been returned because of bookkeeping troubles which were being straightened out. On the same day Esse wired Wunderlich to send the check through again and that it was "okay." On February 12, 1947, Wunderlich advised Esse that the bank had been unable to collect the check, and requested a certified check. Ben L. Selig, one of the partners in Esse, arrived in Kingman on February 12, 1947, and was told that Wunderlich was not delivering any of the items purchased because it had not received the $2,000 cash deposit. Wunderlich demanded another check and Ben L. Selig promised to have a certified check sent. Ben L. Selig left Kingman at that time and returned on February 20, 1947. A certified check dated February 13, 1947, for $2,000 was mailed by Esse to Ben L. Selig in care of Wunderlich. Wunderlich offered evidence that Ben L. Selig agreed to deliver cash or a certified check on or before February 18, 1947. This was denied by Selig.

Wunderlich testifies that on February 19, 1947, it received an offer by a third party at a higher purchase price for one of the items contracted to Esse, and wrote Esse that as it had not adjusted the deposit matter by February 18, 1947, as agreed, it was reserving the right to dispose of any or all of the items contained in the agreement of January 15, 1947. Esse received this letter on February 21, 1947. On March 1, 1947, Wunderlich executed the purchase order agreement with the third party.

On February 20, 1947, Ben L. Selig arrived back in Kingman and tendered the $2,000 certified check to Wunderlich. The check was refused by Wunderlich and Ben L. Selig was advised that the contract had been cancelled. Selig was told that two of the items, APN-4

Radar Scopes and I-152-AM Indicators, which we will refer to as radar scopes and indicators, had been sold to another buyer. Wunderlich offered to deliver the remaining items. After much discussion it was agreed that the two items should be deleted, and the change was mutually initialed on the agreement. The $2,000 certified check was tendered and accepted after the deletion of the two items had been made. On March 4, 1947, Wunderlich was advised by Esse that the first $2,000 check was in fact paid by the Indianapolis bank on January 21, 1947. By the same letter Esse demanded the reinstatement of the original contract of January 15, 1947. Wunderlich refused to reinstate the agreement because it had, on March 1, 1947, contracted to sell all radar scopes and indicators at Kingman Field to another buyer.

It seems clear to us that on February 20, 1947, neither Ben L. Selig nor E. B. Fontaine, the authorized agent of Wunderlich, had any actual knowledge that the $2,000 check bearing the date of January 15, 1946, had been paid by the drawee bank. We do not think that this was a fact upon which either Esse or Wunderlich could rely. The Kingman bank, and each intermediate bank to whom it forwarded the check for collection, was the agent of the depositor Wunderlich. Such being the case, Wunderlich had imputed knowledge that the check was paid on January 23, 1947. Western Smelting & Refining Co. v. First Nat. Bank of Omaha, 150 Neb. 477, 35 N. W. 2d 116; Placek v. Edstrom, 148 Neb. 79, 26 N. W. 2d 489, 174 A. L. R. 856.

The Indianapolis bank is likewise the agent of Esse and the knowledge of that bank is imputed to Esse. Exchange Bank of Wilcox v. Nebraska Underwriters Ins. Co., 84 Neb. 110, 120 N. W. 1010, 133 Am. S. R. 614; Modern Woodmen of America v. Berry, 100 Neb. 820, 161 N. W. 534, Ann. Cas. 1918D 302; Scottsbluff Nat. Bank v. Blue J Feeds, Inc., 156 Neb. 65, 54 N. W. 2d 392. A dual relationship exists between a bank and

its depositor. A debtor-creditor relationship exists with respect to funds on deposit and a principal-agent relationship exists with respect to the payment by the bank of checks drawn by a depositor. 9 C. J. S., Banks and Banking, § 267, p. 546. Consequently, the knowledge of the drawee bank that it had paid the check on January 23, 1947, is imputable to Esse. It is clear therefore that Wunderlich and Esse had imputed knowledge that the check was paid on January 23, 1947. No default existed thereafter because of the alleged nonpayment of the $2,000 deposit. It is urged that Esse estopped itself from asserting that the $2,000 check was paid because it had continuously assumed in dealing with Wunderlich that the check had not been paid. But the very facts upon which the estoppel is claimed were known to be untrue by Wunderlich. An estoppel is no more available to Wunderlich than it is to Esse under the circumstances shown.

The record shows that Wunderlich attempted by letter under date of February 19, 1947, to cancel the agreement of January 15, 1947. It is shown that this letter was not received by Esse in Indianapolis until February 21, 1947. The postal department being the agent of Wunderlich, the letter would not operate as a notice of rescission or cancellation of the agreement until the latter date. On February 20, 1947, Ben L. Selig arrived in Kingman and carried on certain negotiations with Wunderlich. It is the effect of these negotiations which must determine the issues here presented.

On February 20, 1947, Ben L. Selig returned to Kingman. He immediately contacted Wunderlich through Fontaine. Selig tendered the certified check for $2,000, which Fontaine refused on the ground that the contract had been cancelled. Fontaine told Selig that Wunderlich was willing to cancel the whole contract and forget everything. Selig testifies that he knew something was wrong and that Esse was being deceived, and he told Fontaine so. After an argument in which Fontaine

stated he would not reinstate the contract under any circumstances without taking the two items off, Selig agreed to do so under protest. They noted the deletion on the margin of the contract and each indicated his assent thereto by initialling the change.

There is no evidence of a breach of the agreement on the part of Esse. The delay in proceeding under the terms of the agreement appears to have been caused by a misunderstanding of facts which were imputed to each by law. The record shows that Wunderlich did negotiate for the sale of the radar scopes and indicators with Air Industries prior to February 20, 1947. The record shows that Air Industries made a firm offer for these items on February 19, 1947, which was conditionally accepted by Wunderlich. It is quite evident that these negotiations were carried on in contemplation of a breach of the agreement made with Esse on January 15, 1947. These negotiations, which were had with Air Industries in anticipation of a breach of contract by Esse, are important in determining whether or not the agreement was cancelled in good faith. Wunderlich did not enter into a contract of sale with Air Industries until March 1, 1947. Such sale without liability to Esse is dependent upon the right of Wunderlich to rescind the agreement on February 20, 1947, without liability for damages.

We conclude from what we have already said that there was no breach of the agreement of January 15, 1947, by Esse. Esse was insisting upon the fulfillment of the agreement on February 20, 1947, when Wunderlich first notified Esse that the agreement was cancelled. There is evidence in the record that Wunderlich had sold 41 of the radar scopes to others before it attempted to rescind, and it had negotiated with another party for the sale of the remainder of the two items involved here. Even if these acts constituted a breach of the agreement, Esse does not rely on it and Wunderlich cannot take advantage of its own wrong to the injury of

Esse. Esse could waive the breach and properly insist upon compliance with the agreement.

The question immediately presents itself as to whether or not the agreement was modified before or after breach. On February 20, 1947, the date the modification of the original agreement was made, Esse was not in default. Wunderlich advised Ben L. Selig on that day that it had cancelled the contract and that it would not comply therewith unless the two items in question were deleted. This was a breach of the agreement, an unequivocal refusal to comply with the terms of the agreement of January 15, 1947. "Where a party bound by an executory contract repudiates his obligation before the time for performance, the promisee has, according to the great weight of authority, an option to treat the contract as ended so far as further performance is concerned, and to maintain an action at once for the damages occasioned by such anticipatory breach." 17 C. J. S., Contracts, § 472, p. 973.

It is clear, therefore, that after the breach of the agreement by Wunderlich, the parties modified the first agreement by deleting two items. We find that no consideration existed for the modification. The rule in this state is stated in Swanson v. Madsen, 145 Neb. 815, 18 N. W. 2d 217, as follows: "Defendant contends that a contract required to be in writing by the statute of frauds can be altered or modified by parol agreement and that the consideration for the original agreement is sufficient to sustain the new. We think this is true where there has been no breach of an executory contract, but where, as here, the contract had been breached at the time of the modification, a new consideration must be shown." See, also, Moore v. Markel, 112 Neb. 743, 201 N. W. 147; Prime v. Squier, 113 Neb. 507, 203 N. W. 582. In the case before us there was a modification of the original agreement after breach. There being no consideration for the modification, it is not effective to defeat the claim of

Esse. Sallander v. Prairie Life Ins. Co., 112 Neb. 629, 200 N. W. 344.

Our former opinion holds that there was a compromise and settlement of the claims of the parties for a sufficient consideration. On a reconsideration of this point we now conclude that we were in error in so holding. Without discussing the question as to whether or not the defense of compromise and settlement was properly raised, we think the record fails to show any consideration for the settlement. The modification consisted of the deletion of two items and a part of a third item from the contract. Esse protested the deletions but agreed thereto as an inducement to Wunderlich to deliver the other items, which it did. The modification makes no change in the original contract except to provide for a lesser number of items than was contained in the original obligation. Wunderlich was required, on February 20, 1947, to deliver the radar scopes and indicators in accordance with its contract. It forced Esse to agree to a deletion of two items without consideration in order that Esse could obtain the delivery of items which Wunderlich was already obligated to deliver. This does not constitute a consideration under the present holdings of this court. Esterly Harvesting Machine Co. v. Pringle, 41 Neb. 265, 59 N. W. 804; Sallander v. Prairie Life Ins. Co., *supra*. We necessarily conclude that the deletions made in the contract of January 15, 1947, constituted a modification of that instrument. The modifications having been made after a breach of the original contract, a legal consideration was essential to its validity as a justifiable excuse for the nonperformance of the original agreement according to its terms. There being no consideration for the deletion of the two items, any claim of compromise and settlement must likewise fail. 11 Am. Jur., Compromise and Settlement, § 18, p. 264; 15 C. J. S., Compromise and Settlement, § 11, p. 732. A summary of the evidence indicates that Wunderlich's attempted rescission was not

made in good faith. We point out that Ben L. Selig came into the office of Wunderlich and tendered a $2,000 certified check before a notice of rescission of the contract had been received by Esse. The check was refused. The record indicates that Wunderlich had been negotiating with Air Industries for the sale of the radar scopes and indicators. Wunderlich advised Selig on February 20, 1947, that these items had been sold. The record reveals that Wunderlich had discovered that the radar scopes and indicators were of much more value than they had estimated. It is noteworthy in considering the matter of the good faith of Wunderlich in attempting a rescission of the contract that it was willing to abide by the contract if the two items were deleted, such two items being those which it had discovered could be sold for considerably more money than the price fixed in the Esse contract. It is quite clear that the attempted rescission of the contract by Wunderlich was not in fact based on the alleged failure to make the $2,000 deposit, but because of the opportunity to make a much better sale to Air Industries. Wunderlich relied upon a legal right to rescind without payment of damages to accomplish that purpose. Not having such a right, legal remedies are available to Esse. There is no basis for the application of equitable principles. It is clear therefore that Esse has established a cause of action for damages against Wunderlich.

Defendant Wunderlich asserts that the trial court erred in giving its instruction No. 4. The part of the instruction first objected to states: "As regards the existence of the contract the burden is upon the plaintiffs to establish by a preponderance of the evidence that E. B. Fontaine in signing Exhibit 4 for the defendant agreed to sell plaintiffs the items described therein from the four fields other than the Kingman field, to-wit, Walnut Ridge, Arkansas, Chino, California, Altus, Oklahoma and Clinton, Oklahoma, which question you are to determine; but as a matter of law you are instructed that there is

no question but that the defendant has agreed to sell the items in question on the Kingman field to the plaintiffs."

The record shows that the federal government advertised for bids on the surplus aircraft located on the five fields named in the instruction. The aircraft were offered for sale on the basis that any one bid should cover all the aircraft at any one field but that no bidder could purchase the aircraft at more than one field. Wunderlich submitted a bid in accordance with the above conditions and was the high bidder for the aircraft at Kingman, Arizona. The aircraft at the other four fields were sold to Texas Railway Equipment Company, Sharpe & Fellows Contracting Co., Sherman Machine & Iron Works, and Esperado Mining Company. These five companies entered into a joint venture agreement whereby they, under the name of Aircraft Conversion Co., were to disassemble the aircraft and salvage, scrap, smelter, and prepare for market the aluminum scrap from the aircraft on each field within the time and under the conditions of the contract each held with the federal government. There is nothing in this agreement which deprives each of his title to the aircraft it purchased or gives it any interest in the aircraft purchased by the others. Simply stated, it was an agreement providing a joint method of processing scrap for market as a matter of convenience and economy. The joint venture agreement expressly states: "No Joint Venturer shall make any contract, commitment, or expenditure, binding upon or affecting the joint venture or any of the Joint Venturers, without the concurrence or approval of the Joint Venturers; * * * Nothing herein shall in anywise be construed or operate to prevent each Joint Venturer and the Joint Venturers collectively from strictly keeping and performing all provisions of their respective agreements with the Government; and it is specifically provided that each Joint Venturer shall have and retain full power and authority to sell and dispose of the scrap aluminum and other salvage from the planes pur-

chased by him or it, respectively, to such person, persons or concerns, and at such price or prices as he may desire, * * *." The Aircraft Conversion Co. did not purport to sign any of the agreements here involved. This agreement is no aid to Esse's claim that all five fields were bound by Wunderlich's agreement.

Before reducing the aircraft to scrap, each purchaser stripped them of all saleable items, including the 17 items listed in the contract of January 15, 1947, between Wunderlich and Esse. One Harry A. Hammill was a broker operating on all five fields in finding buyers and negotiating the sale of items stripped from these aircraft. He was not authorized to sign contracts for the sellers. The evidence shows that Ben L. Selig inspected the aircraft on three of the fields, including Kingman, in the company of Hammill. At the close of the inspection of Kingman field, Selig evidenced a desire to purchase certain electronic equipment at all five fields at the asking price. Hammill wrote up the purchase order on his own brokerage form. It recited that the buyer offers to purchase: "All fields, Indicator 1-152-AM .50." All items within the offer were designated in a similar manner. The contract being construed is not complete in itself. The fields referred to as "all fields" are not described in the offer to purchase. It is necessary to determine, from sources other than the offer of purchase accepted by Wunderlich, the meaning to be given the term "all fields" and the scope of the liability assumed by Wunderlich when it accepted the offer. Hammill says that 30 copies of the offer to purchase were made out and that four were sent to each field. Hammill and Selig signed all copies before any were submitted to Fontaine. Fontaine accepted the offer for Wunderlich at Kingman field. Other copies were sent to the other fields for signature of the purchaser of the aircraft at the respective fields. Hammill further testifies that the use of the words "all fields" was questioned by Fontaine. Hammill stated: "And the man (Fontaine) was justified

in that. But, I wanted to get out and I guess so did Ben, and I said, 'Don't mess up this deal'. 'Selig and I have got this all straightened out. The fact is, you know what it is; Selig knows what it is; so you haven't got anything to worry about. I'm going to send these to Dahlstrom. It will be taken care of. There's nobody here to rewrite it. I will admit I made a mistake on it. Go ahead and sign it. We understand we are going to just get what you got out in them warehouses.' " Ben L. Selig was present at this discussion. It is true of course that Hammill as a broker for "all fields" was attempting to negotiate a sale of the specified items for all fields, but this does not mean that Fontaine was selling the items on all fields. It is clear that each seller on the various fields bound himself when he accepted the offer to purchase. This is confirmed by Lindsey Youngblood, Wunderlich's sales manager, who testified that he was present at the signing of the contract along with Hammill, Fontaine, and Selig. Youngblood testified: "Mr. Hammill assured us it was intended only for our approval for our field, as he intended to get the approval of the other fields for his proposal." Selig was present when this was said. That Selig knew that the contract purported only to bind Wunderlich and the aircraft it purchased at Kingman is plain. Selig made a subsequent contract with the Texas Railway Equipment Company on the Walnut Ridge field covering all of the same items except one. In this respect, the contract with the Texas Railway Equipment Company was rewritten on the offer-to-purchase form provided by Hammill. The words "All fields" were changed to "All on the field" and an ink line was drawn through "APN-4 $1.00." Otherwise the agreement was identical as to content with the offer to purchase accepted by Wunderlich. The agreement with the Texas Railway Equipment Company was signed by Ben L. Selig. If he purchased the items contained in the contract with the Texas Railway Equipment Company by the contract signed with Wunderlich, as

he now says, the contract with the Texas Railway Equipment Company was wholly unnecessary. It is wholly inconsistent with his contract with Wunderlich under the evidence he now relates. It is plain to us that Selig knew at that time that the agreement with Wunderlich covered only the items at Kingman field. It appears also that Esse subsequently threatened suit against Wunderlich and Texas Railway Equipment Company. Suit was never threatened against the purchasers of aircraft on the other three fields for failure to deliver items contained in the agreement of January 15, 1947. It would appear that Esse was not at that time placing the construction on the scope of the agreement that it now does. We conclude therefore that the contract of January 15, 1947, covering "all fields" meant that the offer covered all five fields but that the owners of the aircraft at the respective fields became bound by it only as each accepted the offer to purchase by attaching its authorized signature thereto. The agreement with Wunderlich, therefore, covered the items at Kingman field, and no other. The trial court should have so instructed. It was prejudicial error to permit the jury to speculate as to whether or not items other than at Kingman field were involved in the litigation.

The jury was also informed by instruction No. 4 that: "As to any future damages, if any, which may be suffered after this date, such preponderance of the evidence must establish the same with reasonable certainty." We find no evidence in the record to support the giving of this part of the instruction. The case was submitted to the jury on May 15, 1953. The breach of the contract occurred on February 20, 1947. The damages to which Esse is entitled are those resulting from the breach. Even a loss of good will, if any be shown which resulted from the acts of Wunderlich, could be established only during the period that orders for radar scopes were not being filled. These orders were received in April and May 1947. No basis exists for authorizing the jury to

return a verdict which would include damages that might occur after the date of the trial.

The trial court also instructed that loss of good will was, if established by a preponderance of the evidence, a proper element of damage. Loss of good will is a special damage which is not recoverable in every action for breach of a contract to deliver goods. 78 C. J. S., Sales, § 550, p. 242. Any loss of good will by Esse arises solely from its inability to make deliveries of radar scopes resulting from orders received through advertisements. The evidence shows that some time after January 15, 1947, the exact time not being shown, Esse placed orders for the advertisement of a great many electronic items in Radio News, CQ (The Radio Amateur's Journal), and Radio Craft, three radio electronics monthly magazines with national circulation. The advertisements appeared in the May 1947 issues and reached the newsstands on or about April 25, 1947. Each magazine carried a three-page advertisement of 19 items. Among the items of electronic equipment there listed was the APN-4 radar scope involved in this suit. It was listed for sale at $17.95. The 1-152-AM indicators were not advertised for sale in these advertisements. The record is not clear as to the exact date on which Esse attempted to eliminate the radar scope from these advertisements. The general manager of CQ Magazine states that Esse first attempted to make a change in that magazine after April 1, 1947, but the closing date for the May issue was March 20, 1947. The advertisement of the radar scope in Radio Craft contained the words "Sold Out" in heavy type and, consequently, it brought in no orders for that item nor contributed to any loss of good will. As to Radio Craft the attempted change came after its closing date for May 1947. This evidence indicates that Esse failed to cancel the advertising of the APN-4 radar scope within a reasonable time after the breach of the contract.

We point out that the contract of January 15, 1947,

was cancelled by Wunderlich on February 20, 1947. On that date Esse knew that the APN-4 radar scopes would not be delivered. Ben L. Selig not only knew this to be the fact, but he had agreed to the deletion of the items on the original purchase agreement by affixing his initials to such an understanding. It is clear therefore that Esse was required to mitigate the damages arising from the breach from and after that date. An authoritative text states the rule as follows: "Where a party is entitled to the benefit of a contract and can save himself from loss arising from a breach thereof at a trifling expense or with reasonable exertions, it is his duty, and statutes sometimes so declare, to do so, and he can charge the party in default with such damages only as with reasonable endeavors and expense he could not prevent. This rule is especially applicable where one of the contracting parties has acquired notice of the breach of contract and makes no reasonable effort to mitigate the damages claimed." 25 C. J. S., Damages, § 34, p. 502. In Marcell v. Midland Title Guarantee & Abstract Co., 112 Neb. 420, 199 N. W. 731, this court stated the rule as follows: "It is a well-established rule in this state that, where there has been a breach of a contract by one party resulting in loss to the other, it is the duty of such other party to take all reasonable steps to reduce the amount of his damages." It is the rule, also, that one who fails to perform such duty may not recover damages which would have been avoided had such duty been performed. Uhlig v. Barnum, 43 Neb. 584, 61 N. W. 749. The foregoing rules have been reiterated by this court in Shamblen v. Great Lakes Pipe Line Co., 158 Neb. 752, 64 N. W. 2d 728.

The record before us does not show that Esse made reasonable effort under the circumstances to cancel the advertising of the APN-4 radar scopes. It knew on February 20, 1947, that these radar scopes would not be delivered. The indefiniteness with which this part of the claim was attempted to be proved is such that it

does not establish any loss of good will which Esse could not have reasonably avoided. If Esse had acted within a reasonable time after February 20, 1947, we think the advertising could have been eliminated, under the evidence as it appears in the record before us. Esse assumes that the obligation to mitigate the damages did not arise until March 18, 1947, or thereafter. The record does not support such an assumption. We are of the opinion that the trial court improperly submitted the loss of good will as an element of damage under the evidence then before it.

It seems to us that Esse has no valid claim for loss of good will unless it is able to show on a retrial that it made reasonable effort after February 20, 1947, to eliminate the APN-4 radar scope from its advertising and was unable to do so. But this does not mean that the advertising of the radar scopes at $17.95 each and the orders received were not properly admitted as evidence. They tend to establish a demand for the radar scope at the advertised price. They tend also to fix the market value of the radar scope. For these purposes the evidence was properly received in any event.

In the case before us Wunderlich knew that Esse purchased the radar scopes and indicators for resale. The record shows a general demand for these items at the advertised price. In addition thereto, Wunderlich certainly understood that the resale of the items would result in a profit to Esse. In such case the seller is bound to know that Esse would be damaged in the amount of the profits lost if the items were not delivered in accordance with the agreement. The measure of damages in such a case appears to be in dispute, particularly as to the correctness of instruction No. 9. That instruction states: "You are instructed that the plaintiffs Selig are not required to prove the extent of their damages with mathematical precision; that, if you find that it is certain that damages have been caused by the breach of the contract, you may then consider all

the facts and circumstances of the case having any tendency to show the probable and reasonable amount of the damages."

The measure of damages for failure to deliver goods purchased is fixed by section 69-467(2), R. R. S. 1943, as follows: "The measure of damages is the loss directly and naturally resulting, in the ordinary course of events, from the seller's breach of contract." Under this section, loss of profits is a proper element of damage. The rule is stated by this court as follows: "We have repeatedly held that gains prevented as well as losses sustained may be recovered as damages upon a breach of contract. But it must appear that the profits were reasonably certain to have been realized by performance; that they are not speculative or contingent; that such damages must have been within the contemplation of the parties, and the loss must appear to have resulted proximately and naturally from the breach." O'Shea v. North American Hotel Co., 109 Neb. 317, 191 N. W. 321. In James Poultry Co. v. City of Nebraska City, 136 Neb. 456, 286 N. W. 337, we quoted with approval the rule announced in Wittenberg v. Mollyneaux, 60 Neb. 583, 83 N. W. 842, as follows: "That a party may recover for gains prevented as well as for losses sustained when such damages are not only certain, but are the natural and probable result of the wrong complained of, is a point no longer open to dispute in this state." From these holdings we gather that damages for breach of contract must be established with reasonable certainty although mathematical precision is not required. Proof of damages is limited to those which naturally and probably result from the wrong. The trial court has a discretion in determining whether or not proffered evidence of damage is within the foregoing rule. We do not say that instruction No. 9 was prejudicially erroneous when considered with other instructions given, but it would have been more strictly in conformity with the rule,

under the particular circumstances of this case, to have closed the instruction as follows: "You may then consider all the facts and circumstances of the case tending to show the amount of the damages."

We conclude that our former opinion was in error in reversing the judgment and directing on remand that defendant's motion for judgment notwithstanding the verdict be sustained. We withdraw our former opinion.

For the reasons herein stated, the judgment of the district court is reversed and the cause remanded for a new trial in accordance with this opinion.

REVERSED AND REMANDED.

YEAGER, J., dissenting.

I respectfully dissent from the opinion in this case. I have come to the conclusion that the true issues and the pattern for their determination have been obscured in both the opinion of this court which has been rejected and the one which now represents the determination of the case. As I view the situation, the issues are comparatively simple and the pattern for determination plain, and in the light of this and the facts as disclosed by the record and reflected in the two opinions the proper result is not left, as I believe, in doubt.

For the purposes of this dissent the parties will be referred to herein by their original status in the action in the district court, that is, as plaintiffs and defendant.

The action as instituted was by plaintiffs for damages for breach of contract for the delivery of merchandise. The defense was that the plaintiffs breached the contract which gave the defendant the right to rescind which right the defendant exercised.

In effect the response of the plaintiffs to this was that they did not breach the contract, but that if they did the breach was waived by the defendant. The defendant denied that there was a waiver.

I fail to see how it may reasonably be said that plaintiffs did not breach the contract. To my mind this fact was conclusively established by the evidence. This be-

ing true I cannot escape the conclusion that the defendant had the right to rescind.

Again conclusively, as I see it, the defendant did exercise its right of rescission. After rescission the parties were in the same status as they were before the contract was entered into except as to their rights and liabilities which flowed from the breach.

After the rescission the plaintiffs had no right or rights against the defendant under the contract and could not thereafter have any unless and until the defendant waived the breach and its rescission. After breach and rescission and in the absence of waiver the defendant was in a position of freedom to do as it chose with the merchandise which was the subject of the contract. It was free to deal in relation thereto as to all or any part of it with the plaintiffs or any other persons or parties the same as if the contract in question here had never been entered into.

I think that on the record it may be said as a matter of law there was no waiver by the defendant. There is of course evidence to the effect that plaintiffs tried to obtain a waiver. However there is no evidence that the defendant responded to this effort or that it restored the breached and rescinded contract.

If this is true, and I am convinced that it is, the defendant was entitled to a judgment in its favor and the opinion of this court should so indicate.

The two opinions referred to deal at considerable length with the question of consideration for the agreement of February 20, 1947. This question, I submit, is not an issue in this case. I do not wish to be understood as saying that the evidence surrounding the incident has no significance. This evidence is significant, however, only as it throws light, if it does, on the question of whether or not there was rescission and, if so, if there was a waiver of rescission. We are concerned here only with the rights and liabilities under the contract which is the basis of this action and not any other

contract of a later date. An assumption either that the contract of February 20, 1947, was supported by a consideration or that it was not could not determine any basic issue herein.

SIMMONS, C. J., dissenting.

I adhere to the former opinion and decision of this court in this case. That opinion is now withdrawn by the court.

In the present opinion, the court finds no fault with either facts or issues stated, or rules of law applied in the former opinion. The former opinion is now set aside on a finding that there was no consideration shown for the contract of February 20, 1947. I shall examine that question later herein.

I disagree with the present opinion in six principal matters:

1. In the findings of fact made in the opinion which appear to become conclusive upon the trial court on remand for a new trial.

2. In relieving the Seligs from the results of their breach of the contract by the giving of the insufficient fund check.

3. In the holding that both parties had imputed knowledge of the payment of the check.

4. In the holding that Wunderlich was guilty of bad faith on February 20, 1947, when the new contract was executed.

5. In the holding that there was no consideration for the contract of February 20, 1947.

6. In permitting Seligs to accept full performance under the February 20, 1947, contract and then repudiate that contract and recover damages for the breach of the January 15, 1947, contract.

I shall discuss these matters in that order.

*Conclusive Findings of Fact Made on Disputed Issues*

We are here dealing with a law action with many issues and disputes of fact. The court now remands for a new trial "in accordance with this opinion." In the

opinion, the court finds that plaintiffs have "established a cause of action." It resolves other facts in favor of plaintiffs. As I read the opinion (and I am not advised to the contrary), those findings of fact now become the law of the case, leaving the only issue to be tried that of the amount of damages. That is contrary to the estab-' lished practice of this court in remand of a law action which is that a remand generally calls for a retrial of all issues.

In Kuhns v. Live Stock Nat. Bank, 138 Neb. 797, 295 N. W. 818, we held: "* * * all matters decided express-ly or by necessary implication by this court in its opin-ion in reversing the first judgment became the law of the case. This applies not merely to all questions ac-tually and formally presented, but to all existing in the record and necessarily involved in the decision."

In Master Laboratories, Inc. v. Chesnut, 157 Neb. 317, 59 N. W. 2d 571, we held: "The general rule is that a reversal of a judgment and the remand of a cause for further proceedings not inconsistent with the opinion, without specific direction to the trial court as to what it shall do, is a general remand and the parties stand in the same position as if the case had never been tried."

What is the trial court now to do if this decision stands?

In the recent case of Gable v. Pathfinder Irr. Dist., 159 Neb. 778, 68 N. W. 2d 500, the judgment was re-versed on the sole ground that there was no proper or competent evidence to fix the amount of plaintiff's dam-age. On motion for rehearing, plaintiff, contending that the judgment should be affirmed, also pointed out that questions of negligence and proximate cause had been decided in his favor and asked for a remand (if that had to be) limited to the sole issue of the amount of dam-ages. He relied upon Harper v. Young, 139 Neb. 624, 298 N. W. 342. A rehearing was denied and a remand limited to that issue was likewise denied.

Why should there be the difference in treatment?

I see no reason for an exception here.

I do not rest my dissent on that ground alone. I disagree with the primary conclusion of the court.

### Who Breached the Contract?

Who set up the chain of events that culminated in this litigation? The answer is conclusive that the Seligs did. The contract of January 15, 1947, called for "cash prior to shipment $2,000 deposit." Seligs gave an insufficient fund check for that "deposit." That act on their part was a material breach. What was its effect?

Corpus Juris Secundum states the rule as follows: "Parties are entitled under the provisions of their contract to that for which they bargained and should not, on breach thereof, be compelled to accept less than that for which their contract called. Accordingly, not only is the party guilty of the first breach of an entire and indivisible contract containing independent covenants and promises precluded from recovering on the contract, * * * but he must answer in some appropriate manner for the loss or injury resulting from such breach to the opposite party, * * *. The party who commits the first breach is also deprived of the right to complain of a subsequent breach by the opposite party." 17 C. J. S., Contracts, § 458, p. 943.

In Demateis v. Vezu, 49 Cal. App. 453, 193 P. 793, a payment of $500 was made by a no-fund check upon the execution of a contract for the sale of grapes. The court held: "Where a buyer fails or refuses, without sufficient cause, to make payment of the first installment of the purchase price of the article contracted to be purchased, the seller is justified in repudiating the contract."

O'Bryan v. Mengel Co., 224 Ky. 284, 6 S. W. 2d 249, was a case involving a sales contract. The court held that the buyer "was not at liberty to break the contract himself and at the same time insist upon performance thereof by the seller. No principle in the law of contracts is better settled than that the breach of an entire and indivisible contract in a material particular excuses further performance by the other party and precludes an

action for damages on the unexecuted part of the contract."

These authorities are brushed aside, apparently on the theory that because the check in the instant case was paid upon its second presentation, no breach occurred. Seligs seem to be entitled to one breach "for free."

*Imputed Knowledge Not Applicable Here*

In the former opinion we held that there was no imputed notice to the parties here. We relied on our holding in Hargadine McKettrick Dry Goods Co. v. Krug, 2 Neb. (Unoff.) 52, 96 N. W. 286, which is as follows: "Notice to or knowledge by an agent is imputed to his principal in those cases only in which it is his duty to act upon it, or to communicate it to his employer, in the proper discharge of his trust as such agent, and it possesses that character in those cases only in which it has a direct relation to the act or business which the agent is employed to do."

The plaintiffs in their motion for rehearing here do not challenge the correctness of that rule or that holding. They do not mention it. The present opinion ignores the rule and holds that there was imputed notice on the ground that the banks were the agents of the parties.

The present opinion concedes that neither Seligs nor Wunderlich had actual knowledge of the fact that the check had been paid. It holds that both had imputed knowledge that the check had been paid, because forwarding and paying banks had that knowledge.

Our rule is not (or should I say was not?) a maverick rule. It is stated in 3 C. J. S., Agency, § 262, p. 196, as follows: "The rule that notice to an agent is notice to the principal is not one of universal application * * * the rule has no application where the agent is not under a duty to communicate the notice or knowledge to his principal."

Also the rule is stated in 2 Am. Jur., Agency, § 372, p. 291, as follows: "The notice to, or knowledge of, an agent which is to bind the principal must be of some

matter so material to the transaction as to make it the duty of the agent to communicate it to the principal, * * * ."

The rule of imputed notice is based on the duty of an agent to communicate material facts to his principal and the presumption that he has performed that duty. 3 C. J. S., Agency, § 262, p. 194; 2 Am. Jur., Agency, § 369, p. 288. Our rule recognized those reasons and states that there is imputed knowledge "in those cases only" in which it is the agent's duty to communicate his knowledge to his principal. This is not a case where a bank is asked about the payment of a check. By this holding it becomes the bank's duty to advise as to the payment of a check on its own motion.

Where is there a duty of a forwarding bank or a paying bank, *on its own motion,* to notify its principal that a check *has been paid?* The statutory duty to protest for dishonor is limited to "foreign bills." § 62-1,152, R. R. S. 1943.

It is common knowledge that banks in America handle daily literally thousands of checks which are forwarded for payment and which are paid. It is now held to be their duty to communicate the fact of handling and payment of a check to the principal for whom they act. Bankers will be interested to know that—and it is the only basis on which imputed knowledge can rest. The necessary conclusion now is not only that the duty to notify of payment exists, but that likewise courts will presume that banks performed that duty. Both the duty and the presumption have no foundation in fact or law.

In the course of our opinion last cited, we held: "It is a harsh and severe rule which imputes to a principal the knowledge possessed by his agent" and "as it is not infrequently the cause of rank injustice, its operation should be rigidly confined to those cases to which it is strictly applicable." We limited imputed notice to *"only"* those cases. I submit that the rule of imputed

notice is not "strictly applicable" here—it is not at all applicable.

However, if we are not going to follow the rule which we have twice stated in accord with general authority, then I submit that we should not ignore the rule, but rather overrule it, and notify banks and their patrons that hereafter in this state we walk alone on that matter. We should not confuse in an area where heretofore there has been no dispute.

### Wunderlich Did Not Act in Bad Faith

Preliminary to and as a basis for the finding that there is no consideration shown is one that Wunderlich's attempted rescission was not made in good faith. This is based on the finding that Wunderlich had, prior to February 20, 1947, negotiated for the sale of some of the items covered by the agreement of January 15, 1947.

There is a rule upon which the texts agree: "An agreement, when changed by the mutual consent of the parties, becomes a new agreement, which takes the place of the old, and consists of the new terms and as much of the old agreement as the parties have agreed shall remain unchanged; in other words, a contract may be abrogated in part and stand as to the residue." 17 C. J. S., Contracts, § 379, p. 869. See, also, 12 Am. Jur., Contracts, § 433, p. 1013; Restatement, Contracts, § 408, p. 770; 6 Williston on Contracts (Rev. ed.), § 1826, p. 5172. We have held: "The applicable rule in such circumstances is that a contract complete in itself will be conclusively presumed to supersede another one made prior thereto in relation to the same subject-matter." Price v. Platte Valley Public Power & Irr. Dist., 139 Neb. 787, 298 N. W. 746.

Now what about good faith and bad faith? It is admitted by both parties that there was a conversation on February 12, 1947, between Fontaine and Selig regarding the contract and the dishonored check. It likewise appears without dispute that Wunderlich was required by its contract to break up and remove all air-

planes within a limited period of time. Fontaine (for Wunderlich) testified that Selig was given until February 18 to make good the dishonored check, and that Selig promised to have the check to Wunderlich not later than February 18. Selig denies that agreement and says it was February 20.

The present opinion states that Selig was told that "two" of the items, APN-4 radar scopes and I-152-AM indicators, had been sold to another buyer; it states that the record shows that Wunderlich did negotiate for the sale of the radar scopes and indicators with Air Industries prior to February 20, 1947, and that those negotiations were carried on in contemplation of a breach of the agreement of January 15, 1947, with Selig; that Wunderlich's attempted rescission was not made in good faith; and that it was not based on the alleged failure to make the $2,000 deposit but because of the opportunity to make a much better sale to Air Industries. But that sale occurred *one day* after the February 18 deadline testified to by Fontaine and after the dishonored check business had arisen and had been discussed between the parties. Can Wunderlich be found guilty of bad faith because Selig denies only the February 18 requirement, when Wunderlich was moving in accord with its understanding of the agreement? Assuming that Wunderlich desired a modification of the contract so as to protect the sale to Air Industries, the question comes: Was Selig deceived and not advised as to that purpose?

It now becomes necessary to refer to evidence, not in dispute and relied on in the present opinion, and to one fact in connection therewith not heretofore pointed out. On February 19 (one day after the February 18 date testified to by Fontaine), Wunderlich received from Air Industries a firm offer for *three* items of equipment. Two of the items were those involved in this lawsuit. The third item was "200 marker beacons" as described. Also on February 19, Wunderlich confirmed the order from Air Industries for the *three* items, subject to the

receipt of a purchase order and a $750 deposit.

Was the fact of the sale to Air Industries of the three items concealed from Selig on February 20? It was not.

Fontaine testified that he told Selig of the interest of other purchasers and Selig consented to the deletion of the *three* items (not two) from the contract. Deleted were 200 marker beacons—the exact number involved in the Air Industries order of February 19. Is it reasonable to suppose that Selig did not know why an exact number of marker beacons was being deleted, and did not know that Wunderlich was then protecting against the sale of those *three* items to Air Industries and that that was their purpose in insisting that the items be deleted before a new contract was made? The specific deletion of "200 marker beacons" from the items covered shows that they were protecting against that sale and that Selig knew it. He initialed the deleted items *separately.*

Ben Selig testified that "They did not have an offer of a much higher figure on those." How did he know if he was not told of the offers which Wunderlich had? Selig testified that they wanted "these other items we could make money on." Quite obviously "marker beacons" was not one of them. They make no complaint about that deletion.

Any question as to Seligs' knowledge or lack of knowledge is set at rest by their petition herein, sworn to by Stanley Selig, in which it is alleged that on February 20 Ben Selig was informed by Fontaine that Wunderlich had cancelled the purchase order of January 15 and "could not have completed it in any event * * * because part of the merchandise had been sold to others."

This record does not sustain a conviction of Wunderlich of bad faith and certainly does not sustain the court's accolade of good faith of the Seligs in the position which they now take. Both parties made the new contract with knowledge of what had been done by Wunderlich and why the deletions were necessary.

Is bad faith now to be bottomed on a full and admitted disclosure of material facts?  Is bad faith to be charged because a party refuses to make a contract to sell something which he cannot deliver and which the buyer knows he cannot deliver?

The present opinion holds that the attempted rescission of the contract by Wunderlich was not in fact based on the alleged failure to make the $2,000 deposit, but because of the opportunity to make a much better sale to Air Industries.

That same issue of bad faith was raised in the $500 no-fund check case of Demateis v. Vezu, *supra*.  The opinion recites:  "Appellant claims that the attempted rescission was an act of bad faith prompted by the fact that between the date of the contract and the date of rescission there was a great increase in the market price of black grapes. It is true that the market price of grapes advanced within the specified period of time; but this fact is not alone sufficient to compel a finding that such advance market price was the cause of defendant's rescission of the contract.  The court found that the defendant acted in good faith, and that finding is well warranted by the evidence, which tends to prove that defendant rescinded the contract for the very definite and sufficient reason that the check, which he had received on the positive assurance that it was good and in consideration whereof he had delivered the contract, had been dishonored and had so remained for a period of nearly one month."

That describes the situation here.

*There Was A Consideration For The February 20, 1947, Contract*

I have discussed the "marker beacons" deletion for another reason.  The agreement of January 15 was a purchase order whereby Seligs agreed to purchase as well as Wunderlich agreed to sell.

Seligs contend that the agreement of January 15 was to buy all of the items listed in each category.  Seligs by the agreement of February 20 were relieved of the

obligation to buy 200 marker beacons. Ben Selig testified that "they would throw them on us; marker beacons. They never had a resale for them at a much higher figure." Obviously, Seligs were glad to be relieved of that burden of the contract as to the 200 marker beacons. They accepted and retained that benefit flowing from the February 20 contract deleting that item.

There was a clear and established benefit to Seligs in this modification of the contract on February 20, 1947. We have held: " 'A valuable consideration may consist either in some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other.' " Asmus v. Longenecker, 131 Neb. 608, 269 N. W. 117.

There is another consideration shown here, the fact of which is recited in the proposed opinion. Its impact on the case is ignored.

I start now with the premise based on the conclusion of the present opinion that each of the parties had imputed knowledge of the fact that the first $2,000 check had been paid. On February 20 no goods had been delivered by Wunderlich to Seligs. Seligs did not then owe and were under no contractual obligation to pay Wunderlich any money. Wunderlich had no right then to demand any money. Seligs paid and Wunderlich accepted $2,000 as the consideration for the new contract. It was accepted by Wunderlich only on condition that the original contract be modified. Seligs paid under that condition. There is no dispute in the record on that matter.

I have always been of the impression that a money payment was an adequate consideration.

*Seligs Having Accepted Full Performance of The February 20, 1947, Contract Cannot Now Repudiate That Contract*

Following their $2,000 payment of February 20, 1947,

Wunderlich began to deliver under the new contract. Seligs began to accept under the new contract. When the fact of the payment of the protested check was brought home to Wunderlich, credit was given to Seligs for that $2,000 on goods delivered under the new contract. Seligs, with full knowledge, accepted the credit and continued to accept deliveries under the February 20 contract. Having panned the quick gold out of the items received that "we could make money on," Seligs now undertake to repudiate and avoid, and desire to dredge more gold. They retain the benefits received from the performance of the new contract and at the same time repudiate it and seek damages for failure of performance of the original contract. Wunderlich performed in reliance on the new contract.

This calls for an application of the rule that where a modified contract has been executed by one party to such an extent that it would work a fraud upon the other party if repudiated, the modified contract will be sustained. United States v. Slater, 111 F. Supp. 418; Agel & Levin v. Patch Mfg. Co., 77 Vt. 13, 58 A. 792; Thurston & Hays v. Ludwig, 6 Ohio St. 1, 67 Am. D. 328. See, also, Restatement, Contracts, § 90, p. 110, followed by us in Fluckey v. Anderson, 132 Neb. 664, 273 N. W. 41; 12 Am. Jur., Contracts, § 112, p. 605; 17 C. J. S., Contracts, § 74, p. 428.